Submitted on remand from the Oregon Supreme Court November 30, 2004, affirmed February 2, 2005

# STATE OF OREGON,
## *Respondent,*

*v.*

# BRADLY MORRIS CUNNINGHAM, SR.,
## *Appellant.*

## C930434CR; A87792

105 P3d 929

·George Kelly for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, Ann Kelley and Robert M. Atkinson, Assistant Attorneys General, for respondent.

Before Haselton, Presiding Judge, and Edmonds and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals his conviction for murder. ORS 163.115. On appeal, he raises numerous assignments of error, one of which was resolved in the state's favor in *State v. Cunningham*, 337 Or 528, 99 P3d 271 (2004). The Oregon Supreme Court remanded the case to this court for consideration of defendant's remaining assignments of error. We reject without discussion most of defendant's assignments of error and write to address three of them: (1) Whether the trial court erred in admitting the state's DNA evidence; (2) whether the trial court erred in ruling that defendant's DNA expert testimony should be precluded due to a discovery violation; and (3) whether the trial court denied defendant his right to due process under the Fourteenth Amendment to the United States Constitution in determining his competency to stand trial. For the reasons that follow, we affirm.

The basic facts of the case are set forth in detail in the Oregon Supreme Court's decision and in our initial opinion. *State v. Cunningham*, 179 Or App 359, 40 P3d 1065, *adh'd to on recons*, 184 Or App 292, 57 P3d 149 (2002). We will describe the facts pertaining to each assignment of error separately in our discussion below.

We turn first to the assignments of error pertaining to the DNA evidence. The victim was murdered while sitting in her van. At trial, eight years after the murder, the state presented evidence that a hair found in the victim's van contained genetic material on the hair shaft that was not consistent with the victim's DNA (which would be expected to be found on the root of a hair) but was consistent with defendant's DNA, as well as with the DNA of approximately ten percent of the population. Defendant challenged the scientific validity of the hair shaft evidence and also sought to present evidence from his own expert indicating that the genetic material on the hair shaft actually was consistent with approximately 50 percent of the population. The trial court admitted the state's evidence but excluded defendant's evidence due to a discovery violation, as set forth in greater detail below. *See* 197 Or App at 269-73.

■ On appeal, defendant argues that the trial court erred in admitting the state's DNA evidence. He asserts that the court should have allowed his motion to exclude the state's polymerase chain reaction (PCR) DNA evidence concerning the hair shaft at trial on the ground that it failed the test from *State v. Brown*, 297 Or 404, 442, 687 P2d 751 (1984), for the admission of scientific evidence. Defendant acknowledges that, in *State v. Lyons*, 124 Or App 598, 863 P2d 1303 (1993), this court held PCR DNA evidence to be admissible and that, after the trial of this case in 1994, the Oregon Supreme Court affirmed that result. *State v. Lyons*, 324 Or 256, 924 P2d 802 (1996). Defendant argues, however, that the *Lyons* cases are not controlling in this case because, here, the DNA on the hair shaft was from a "contaminant."[1] The state responds that, under *Lyons*'s analysis, defendant's challenges go to the weight and not the admissibility of the evidence.

In *Lyons*, a murder case, a forensic consultant used the PCR method to perform DNA tests on hair and saliva samples removed from the victim's body. *Lyons*, 124 Or App at 602. While the saliva samples produced inconclusive results, two hairs were determined to have come from a person with the same genetic markers as the defendant, a type that was common to two to three percent of the Caucasian population. *Id.* In addressing the propriety of forensic use of the PCR method, we stated:

> "There is * * * disagreement among experts about whether the PCR method is appropriate for forensic use. The disagreement centers primarily on the fact that samples obtained at the crime scene are often produced and recovered under adverse conditions that can result in various forms of contamination before the sample ever reaches a laboratory. The potential for contamination is present in the collection, identification and retention of most forms of forensic-type evidence. The potential for contamination presents an 'open field' for cross-examination at trial, but does not indicate that the PCR method is inappropriate for forensic use."

---

[1] Defendant makes various other arguments in conjunction with this assignment of error that we reject without discussion.

124 Or App at 607-08. Ultimately, given that determination, and others, we concluded that the use of DNA evidence produced by the PCR method satisfied the requisites of *Brown* and, thus, such evidence was admissible under OEC 702 and 403. *See Lyons*, 124 Or App at 610.

The Supreme Court reached the same conclusion. *Lyons*, 324 Or at 279-80. In so holding, and particularly in assessing the "potential rate of error" of the PCR method, the Supreme Court addressed the potential for "contamination" of DNA samples:

> "The state concedes that forensic DNA samples, as compared to samples obtained for medical research or for other nonforensic purposes, more often are contaminated or degraded. However, concerns about contamination and degradation of forensic samples are not unique to DNA samples. Those concerns may arise with respect to any forensic evidence. The potential for contamination may present an open field for cross-examination or may be addressed through testimony of defense experts at trial, as is true of other forensic evidence. However, it does not mean that the PCR method itself is inappropriate for forensic use."

*Id.* at 274.

From the foregoing, it is apparent that both courts in *Lyons* were using the term "contamination" in a different sense than the state's DNA expert used the term "contaminant" in this case. In *Lyons*, "contamination" was used, in context, to refer to substances that may adhere to an item of evidence *after* the evidence is collected from a crime scene. Here, when understood within the totality of the state's DNA expert's testimony, the expert's references to a "contaminant" described material that was present at the time the evidence was collected but was not intrinsic to the item being typed (here, a hair shaft). In particular, the record shows that the state's expert discovered the DNA material in question while attempting to discern the DNA type of a hair found on the victim's body. A hair follicle may contain the DNA of the individual who shed the hair; a hair shaft does not. The forensic expert therefore attempted to type the shaft and the follicle separately. The shaft, which was not expected to reveal any DNA, showed a "contaminant"—that is, it showed the DNA

of a different type than that of the person who shed the hair. Thus, the hair shaft had, at some point, been "contaminated" with bodily tissue from somebody with the same DNA type as defendant (as well as approximately ten percent of the population, according to the state's expert). There was no way for the expert who discovered that DNA on the hair shaft to determine when, or how, the DNA got onto the hair shaft.

It certainly was arguable that the DNA on the hair shaft might have been introduced during the course of the police investigation, or even during the processing of the evidence at the laboratory. As noted in *Lyons*, defendants may develop such theories through cross-examination or through presentation of expert testimony. *Lyons*, 324 Or at 274. However, the mere fact that the state's expert referred to the DNA here as a "contaminant" on the hair shaft—that is, something on the hair shaft that was not an intrinsic part of the hair shaft—in no way suggests any likelihood that that material was introduced *after* the commission of the crime—*viz.*, in the course of the police investigation or the lab work—rather than during the commission of the crime. Nor is there any basis for concluding that DNA found on a piece of evidence that normally does not contain DNA is necessarily less reliable than DNA evidence found elsewhere. We thus reject defendant's suggestion that the DNA evidence should not have been admitted because it was a "contaminant" and sustain the trial court's admission of that evidence as satisfying the requirements of OEC 403.

We turn next to defendant's contention that the trial court erred in ruling that, as a sanction for a discovery violation, *defendant's* DNA expert would not be permitted to testify. Because any assessment of the correctness of the trial court's ruling is inextricably intertwined with the particular circumstantial context, we recount those circumstances in detail.

Because of scheduling difficulties at trial, both the state's DNA expert, Cecelia vonBeroldingen, and defendant's DNA expert, Randell Libby, were expected to testify on the same day, December 12. On the morning of December 12, the prosecutor noted that vonBeroldingen would prefer to testify the following day. The prosecutor also stated that he had not

had an opportunity to speak to Libby, the defense expert; that he had not received any discovery from Libby; and that he would prefer to speak to Libby before putting on vonBeroldingen's testimony. Defendant asserted that Libby was available to testify on December 12 and that day only, and objected to his expert testifying before the state's expert testified. Defendant also informed the court that Libby had prepared no written report—and that that was why the prosecutor had not received any discovery pertaining to Libby. The following exchange then took place:

"[PROSECUTOR]: What I propose is I have an opportunity to speak with [Libby] today and then we call [vonBeroldingen] in the morning [on December 13].

"THE COURT: But then [Libby's] not available to testify tomorrow?

"[DEFENDANT]: That's right.

"[PROSECUTOR]: Why isn't he available to testify tomorrow?

"THE COURT: Where is he, Mr. Hunt?[2] Why couldn't he be here?

"MR. HUNT: Your Honor, Dr. Libby is in the back. Why don't you stand. And if you aren't available, tell the court when and why and if you have to return.

"DR. LIBBY: Well, I do have to return. I have some other commitments for tomorrow. Actually, I have to be in another Crime Lab. I could become available, if that were necessary. But I still would need to return back to Seattle tonight. So I could be available, in essence, tomorrow. Perhaps sometime after noon.

"THE COURT: All right, let's—

"Are you willing to talk with [the prosecutor] or someone from his office during the noon hour today?

"DR. LIBBY: Sure. I have no problem.

"THE COURT: All right, let's just ask Miss vonBeroldingen to be here after lunch today. She agreed on the stand to be here today. I understand it's probably difficult after the travel, but—

---

[2] Hunt was one of defendant's attorney-advisors at trial.

"[THE PROSECUTOR]: That's fine.

"THE COURT: —it's important for her to be here this afternoon. And you talk with Dr. Libby during the noon hour. And I'll take a longer break, maybe until 1:30, to give you ample time to prepare. And then let's have Miss vonBeroldingen on right after lunch, and then he [Libby] can testify later after she is done. And maybe we'll get it all done today."

In the early afternoon of December 12, vonBeroldingen testified as the final witness in the state's case. As discussed above, vonBeroldingen's testimony concerned a hair found in the victim's van that contained a contaminant on the shaft that she opined was consistent with defendant's DNA, but also was consistent with approximately ten percent of the population.

Libby then began his direct testimony. Part way through that testimony, the prosecutor asked some questions in aid of objection concerning whether Libby had prepared a list of questions for defendant to ask him. Libby indicated that he had done so and ultimately acknowledged that he had prepared seven-and-one-half pages of questions for defendant's use in conducting his direct examination. The court then excused the jury and examined that seven-and-one-half page document. The court noted that the document included "factual leading questions with the proposed answer that are very technical in nature, which amounts to, in my view a report or statement that the expert intends to give." Given that conclusion, the court determined that ORS 135.835[3] required disclosure of such a statement to the state.

The prosecutor then asked that the remainder of Libby's testimony be precluded as a sanction for the discovery violation, stating that, "in this hypertechnical area, it's imperative that information be forwarded as quickly as possible, and it wasn't."[4] Defendant did not argue that no discovery violation had occurred.[5] Nor did defendant urge any

---

[3] The pertinent text of ORS 135.835 is quoted below. *See* 197 Or App at 276.

[4] It appears from the record that Libby had provided the question list to defendant's attorney-advisors three days before he testified.

[5] Defendant, who was representing himself, indicated that he had received the information only the evening before from one of his attorney-advisors and that he "didn't realize it was a statement." He further stated that he "assumed that what was required [for] the court would have been followed."

lesser sanction. The court ruled that Libby "will not testify further, as a sanction for the discovery violation." Defendant then moved for a mistrial but did not offer any legal argument in support of his motion at that time, and his motion was denied. The court informed the jury that Libby would not be providing any further testimony, then adjourned for the day at 4:45 p.m. on December 12.

The following morning, December 13, defendant renewed his motion for a mistrial, submitting a supporting memorandum. That memorandum invoked *State v. Mai*, 294 Or 269, 656 P2d 315 (1982), and other appellate opinions that instruct that, in determining whether exclusion of a witness was a proper sanction for a discovery violation, the trial court should consider the prejudice to the opposing party, as well as whether a lesser sanction would be appropriate. In an abbreviated offer of proof, one of defendant's attorney-advisors asserted that Libby would have testified that, when properly analyzed, the DNA material that was the subject of vonBeroldingen's testimony was consistent with approximately 50 percent of the human race. Libby would also have testified concerning alleged deficiencies in the process used by the lab in analyzing the DNA material.[6] Defendant argued that a mistrial was necessary because the jury had been tainted by the court's comment that Libby would be providing no further testimony and because *"Dr. Libby is no longer available to testify in any event."* (Emphasis added.)

The court denied defendant's motion. In so ruling, the court made the following findings:

"15. The defendant created a dilemma for the Court because the list [of questions] was not revealed until approximately 4:00 p.m. on the only day that Dr. Libby was available to testify;

"16. The State was prejudiced by the timing of the events, because no meaningful cross-examination could be conducted without an opportunity to evaluate the highly technical information from Dr. Libby and consult with the state's expert;

---

[6] Defendant later submitted a much more elaborate offer of proof of Libby's proposed testimony.

"17. Rebuttal testimony by the State's expert would not be sufficient to overcome the prejudice without proper cross-examination of Dr. Libby;

"18. Defendant made no effort to mitigate the impact of the violation by offering to make Dr. Libby available on another court day;

"19. No other lesser sanction was suggested by defendant[.]"

Several days later, defendant filed exceptions to the trial court's findings, stating, in part: "Defendant objects to any implied finding that Dr. Libby in fact would not have returned to testify the next day. Dr. Libby told the court on the record that * * * he could be in court the next day to testify[.]"

■ On appeal, defendant assigns error only to the trial court's initial ruling precluding Libby's testimony and not to the court's subsequent denials of defendant's motion for mistrial. The description of the sixth assignment of error in appellant's brief states:

"Specifically [defendant] assigns the following ruling as error:

" 'THE COURT: You may step down, Dr. Libby. I'm going to sustain the state's objection. The witness will not testify further as a sanction for the discovery violation.' "

In that regard, defendant raises three related arguments contesting the court's preclusion of Libby's testimony: (1) The failure to provide the list of questions and answers that Libby produced did not violate ORS 135.835 because that document did not constitute a "report or statement" within the meaning of ORS 135.835(2). (2) Even if that nonproduction was a discovery violation, the state was not prejudiced by that violation. (3) In all events, the trial court erred in failing to employ a less severe sanction than preclusion of Libby's testimony.

 We begin by emphasizing that defendant is *not* assigning error to the denial of his motion for a mistrial. Rather, defendant's assignment of error pertains solely to the court's predicate ruling that Libby's testimony would be precluded. Given the facts recited above, *see* 197 Or App at 270-72, it is doubtful whether defendant preserved any objection

to the trial court's action other than through his motion for a mistrial. That is, the record does not disclose a discrete, contemporaneous objection by defendant or his attorney-advisors to the court's December 12 ruling that is the object of his assignment of error. *See* 197 Or App at 273. In particular, defendant did not assert on December 12 that the list of questions and answers that Libby had developed did not constitute a "statement or report" for purposes of ORS 135.835. Nor did defendant assert that, even if a discovery violation had occurred, preclusion of Libby's testimony would be inappropriate either because the state had not been substantially prejudiced or because any prejudice could have been alternatively ameliorated through less severe measures.

In all events, implicit in defendant's assignment of error is the assumption that, even in the absence of a contemporaneous objection, the trial court, after making the determination that there had been a discovery violation, had an obligation to consider *sua sponte* the degree of prejudice suffered by the state and whether a lesser sanction than exclusion of the witness would be a sufficient cure for the violation. That assumption is wrong. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000).

ORS 135.865 gives the court various options when a violation of ORS 135.835 occurs:

> "[T]he court may order the violating party to permit inspection of the material, or grant a continuance, or refuse to permit the witness to testify, or refuse to receive in evidence the material not disclosed, or enter such other order as it considers appropriate."

In *Mai*, the court held that the sanction under ORS 135.865 of excluding a defense witnesses's testimony

> "should be imposed only when no lesser sanction would accomplish the aim of the statute, and then only if the state would be prejudiced if the witness or witnesses were permitted to testify even though the statute had not been complied with."

*Mai*, 294 Or at 277.

In *Wyatt*, the court considered whether, even in the absence of a specific argument, a trial court was obligated

under *Mai* to consider the prejudice to the state and the availability of lesser sanctions before imposing the sanction of exclusion of a witness. There, the defendant had failed to provide timely notice under ORS 135.835 of his intent to call an expert witness. 331 Or at 337-38. When the prosecutor objected to the testimony on the ground of the discovery violation, the defendant did not argue "that there was no discovery violation or that there was no prejudice to the state." *Id.* at 338. Moreover, defendant "did not ask the trial court to consider alternatives to precluding [the expert's] testimony." *Id.* The court held:

> "When, as here, a party subject to a sanction for a discovery violation does not deny at trial that it is subject to *some* sanction, its failure to object to the particular sanction imposed by the judge or, in the alternative, to argue for some other sanction, fails to preserve a claim on appeal that the judge erred in failing to consider the availability of a less onerous sanction."

*Id.* at 343 (emphasis in original; footnote omitted).

In this case, after the court had concluded that there had been a discovery violation and announced the sanction of exclusion of the witness, defendant moved for a mistrial without stating any grounds for his motion. It is not possible to infer either from the unadorned motion for a mistrial or from defendant's earlier statements to the court concerning his receipt of the questions and answers either that he was arguing that no discovery violation occurred or that the state had not been prejudiced, much less that he was advocating for a lesser sanction than exclusion of his witness. In short, to the extent that defendant is assigning error to the trial court's *initial* ruling that a discovery violation had occurred and its determination of a sanction, that assignment of error is not preserved.

To the extent that we view defendant's assignment of error as an inartful attempt to challenge the trial court's denial of his written mistrial motion filed the day after the court ruled that Libby's testimony should be excluded, that argument fails as well.[7] In that motion, defendant first

---

[7] We assume, for the sake of argument, that the mistrial motion was timely despite the passage of a day, given that the court adjourned immediately after

argued that no discovery violation under ORS 135.835 had occurred. That statute provides, in part:

"Except as otherwise provided in ORS 135.855 and 135.873,[8] the defense shall disclose to the district attorney the following material and information within the possession or control of the defense:

"\* \* \* \* \*

"(2) Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons, that the defense intends to offer in evidence at the trial."

On appeal, as in his written memorandum to the trial court, defendant asserts that Libby's list of questions and answers is not a report or statement within the meaning of ORS 135.835(2). He relies solely on *State v. Bray*, 31 Or App 47, 569 P2d 688 (1977), for the proposition that "fragmentary notes" do not fall within the scope of that statute. The state argues that *Bray* is distinguishable from the present case. We agree that *Bray* is distinguishable.

In *Bray*, we interpreted ORS 135.815, which contains provisions similar to ORS 135.835 but applies to a defendant's discovery of materials upon which the state intends to rely at trial. The alleged discovery violation in *Bray* was the failure of the arresting officer to turn over to the defendant notes that the officer made at the scene of the arrest:

"[The officer] recorded his observations of defendant in abbreviated form, in pencil, on the back of his traffic citation booklet. He later prepared his report of the arrest from the pencilled notes and, as was his custom, he then erased them. The report was furnished to the defense."

*Bray*, 31 Or App at 49. We held:

"[W]e construe the statute to require production of any 'statement' which is intended by its maker as an account of

---

excluding Libby's testimony and denying defendant's oral mistrial motion and that the written motion was filed the following morning.

 [8] Defendant does not assert that either of those exceptions has any application here.

an event or a declaration of fact. The statutory purposes of providing witness statements are to minimize surprise, avoid unnecessary trials, provide adequate information for informed pleas and to promote truthful testimony by allowing examination based on prior inconsistent statements. Proposed Oregon Criminal Procedure Code at 186 (1972). Requiring preservation and availability of fragmentary notes intended only as a touchstone for memory would be more likely to discourage police officers from taking notes, with a consequent reduction in accuracy, than to promote the statutory goals. Furthermore, it would be unfair and misleading to allow cross-examination of a witness based upon fragmentary or cryptic notes which were never intended to express a complete statement. For these reasons we hold that fragmentary notes are not subject to production under the discovery statutes."

*Id.* at 51.

Defendant asserts, and we agree, that the *questions* themselves are not "reports or statements," as they obviously cannot be said to be "an account of an event or a declaration of fact." *Id.* However, a significant number of the questions had answers after them, some "yes" or "no," and others more elaborate.[9] Thus, properly understood, the issue is whether the questions *and answers* together should be regarded as a "report or statement" of defendant's expert for purposes of ORS 135.835.

We believe that Libby's list of questions and answers differs significantly from the "fragmentary notes" at issue in *Bray*. Unlike the notes in *Bray*, the questions and answers here were not preliminary notes used in the production of a final report that would serve as the basis for testimony of the person who created them; rather, they were the final product

---

[9] For example, some of the questions and answers were:

"What types of gel electrophoretic systems are you familiar with? (Ans: agarose, denaturing/non-denaturing polyacrylamide, SSPC gels, sequencing gels, etc.)

"* * * * *

"Why were those samples declared to be inconclusive? (Ans: faint 'dot' intensity or did not produce any visible typing pattern)"

that was intended to be used in eliciting that person's testimony. They were not "intended only as a touchstone for memory" for the witness. *Bray*, 31 Or App at 51. Rather, as noted, Libby did not even have a copy of them when he testified. *See* 197 Or App at 271. Finally, it could hardly be said that it "would be unfair and misleading to allow cross-examination of a witness based upon" those questions and answers, *Bray*, 31 Or App at 51, given that they were prepared for the sole purpose of guiding the *direct* examination of this witness. In short, the question and answer list in this case had little in common with the fragmentary preliminary notes at issue in *Bray*, because it was actually intended for use at trial. The trial court correctly concluded that defendant's failure to provide that list constituted a violation of ORS 135.835.

■ In his memorandum in support of the mistrial motion, defendant also argued that, regardless of whether that nondisclosure constituted a discovery violation, the state had not been prejudiced by that violation (and, by implication, that a lesser sanction would have been available) because the prosecutor could have requested a recess after Libby's direct testimony and "could have gone over the questions with Ms. vonBeroldingen during such recess." However, that argument must be viewed in light of defendant's assertion *in the same memorandum* that "Dr. Libby is no longer available to testify in any event," and that, thus it was "too late to remedy this destruction of [defendant's] right to a fair trial before this jury." As noted above, the discovery violation was brought to the court's attention at about 4:00 p.m. on the day that Libby was testifying, shortly after Libby had begun his direct testimony. At *that* time, defendant did not object to the court's finding of a discovery violation or argue in favor of a lesser sanction. Nor did defendant suggest that the state was not prejudiced because, after Libby's direct testimony, a recess could be taken to provide the prosecutor an opportunity to go over the seven-and-one-half single-spaced pages of questions and answers with the state's expert and then conduct Libby's cross-examination immediately thereafter. Given the amount of data, its technical complexity, and the time constraints involved, we conclude that the trial court did not err in determining that the failure to provide the questions and answers to the state was prejudicial.

■ Defendant first raised the possibility of a lesser sanction in his memorandum filed the *following day* (December 13), but he did not suggest that a lesser sanction actually was *possible* at that point. To the contrary, defendant explicitly stated that the potential lesser sanction that he suggested— that the prosecutor be given time to go over the questions and answers with the state's expert before cross-examination of Libby—was *not* possible because Libby was no longer available. *See* 197 Or App at 272. In short, by the time defendant raised the issue of a lesser sanction, it was in the context of arguing that the court had erred in failing to impose that lesser sanction *sua sponte* and that it now was too late to remedy that error in any manner other than granting a motion for a mistrial. Given the rationale underlying the court's holding in *Wyatt*, we conclude that defendant did not adequately preserve the issue of a lesser sanction because he did not make a timely argument that the trial court actually could *cure* the discovery violation with a lesser sanction.[10]

In sum, we conclude that, to the extent that defendant preserved his arguments concerning the exclusion of Libby's testimony, the trial court committed no error.

We turn, finally, to defendant's assignment of error that the trial court violated his rights to procedural due

---

[10] Defendant asserts repeatedly on appeal that the trial court's finding that Libby would not be available to testify on any other day was erroneous. In that regard, defendant points to the verbal exchange quoted above in which the court, the prosecutor, and Libby discussed the possibility that he could rearrange his schedule to be present the following afternoon. *See* 197 Or App at 270-71. What that argument ignores, however, is that (1) the trial court's finding that Libby would not be available any other day was made in response to defendant's mistrial motion filed the day after that verbal exchange; and (2) in his memorandum in support of that motion, defendant specifically asserted that *"Dr. Libby is no longer available to testify*[.]" (Emphasis added.) It was defendant's, not the trial court's, obligation to determine if and when defendant's witness was available to testify. The trial court was not required to second-guess defendant's factual assertion that Libby was no longer available.

Given those circumstances, defendant's position on appeal smacks of invited error: Defendant told the trial court that, as of December 13; Libby was no longer available, and the trial court accepted that representation at face value. A party on appeal is in no position to complain that a trial court erred in accepting that party's own factual assertion. *See, e.g., Morrissey v. Dennis*, 152 Or App 397, 952 P2d 572 (1998) (where plaintiff's counsel had asserted that the payoff obligation on a land sale contract was a specific dollar amount, plaintiff would not be heard on appeal to complain that the figure was erroneous).

process under the Fourteenth Amendment to the United States Constitution when conducting a midtrial hearing to determine if defendant was competent to stand trial. Again, because our analysis of this matter is so intertwined with the surrounding circumstances, a detailed account of those circumstances is required.

Defendant represented himself at trial but was assisted by two attorney-advisors. Several days into the trial, after defendant had attempted cross-examination of a number of the state's witnesses with limited success, his attorney-advisors filed a motion for a hearing to determine defendant's competency to proceed with the trial. They requested that the court order a psychiatric evaluation pursuant to ORS 161.365 to determine if, as the result of a mental disease or defect, defendant was unable to understand the nature of the proceedings against him, to assist and cooperate with his counsel, or to participate in his defense. *See generally* ORS 161.360 (describing mental disease or defect that may render criminal defendant incapacitated from standing trial).[11]

---

[11] ORS 161.360 provides:

"(1) If, before or during the trial in any criminal case, the court has reason to doubt the defendant's fitness to proceed by reason of incapacity, the court may order an examination in the manner provided in ORS 161.365.

"(2) A defendant may be found incapacitated if, as a result of mental disease or defect, the defendant is unable:

"(a) To understand the nature of the proceedings against the defendant; or

"(b) To assist and cooperate with the counsel of the defendant; or

"(c) To participate in the defense of the defendant."

ORS 161.365 provides, in part:

"(1) Whenever the court has reason to doubt the defendant's fitness to proceed by reason of incapacity as defined in ORS 161.360, the court may call to its assistance in reaching its decision any witness and may appoint a psychiatrist or psychologist to examine the defendant and advise the court.

"(2) If the court determines the assistance of a psychiatrist or psychologist would be helpful, the court may order the defendant to be committed to a state mental hospital designated by the Department of Human Services for the purpose of an examination for a period not exceeding 30 days. The report of each examination shall include, but is not necessarily limited to, the following:

"(a) A description of the nature of the examination;

"(b) A statement of the mental condition of the defendant; and

"(c) If the defendant suffers from a mental disease or defect, an opinion as to whether the defendant is incapacitated within the definition set out in ORS 161.360."

The attorney-advisors brought the issue to the court's attention shortly after defendant had attempted to cross-examine the victim's mother. During that cross-examination, defendant had asked the witness whether she wanted to poison him and to kidnap his children (her grandchildren) and whether she wished that she had aborted the victim (her daughter). In a colloquy outside of the jury's presence, the attorney-advisors indicated to the court that defendant was refusing to take their advice on how to conduct the defense. The advisors did not believe that defendant was intentionally sabotaging his defense, but they did believe that he was incapable of participating in his own defense. Defendant then told the court that he disagreed with his attorney-advisors about his competency and objected to their motion, but that he would cooperate with an evaluation of his competency. The court expressed its opinion that defendant's cross-examination of the victim's mother was "almost bizarre" and indicated that it would appoint an independent evaluator.

Several days later, the court again addressed the matter:

"I did receive a preliminary report by phone yesterday from Dr. [Donald] True, who I have appointed to evaluate Mr. Cunningham on the issue raised by counsel the other day. His preliminary indication is that there are some results of some tests that he apparently administered to Mr. Cunningham as a part of his examination that cause him some concern, and so he's not prepared yet to give a formal opinion. He will be prepared to do so after the long weekend. And he intends to follow up with some additional evaluations. I wanted to bring it up now, because I'm going to give the state a couple of options here. Clearly you're entitled to request that Mr. Cunningham be evaluated by your own professional, pursuant to the statute; or I suppose the other option would be to wait and see what Dr. True reports, and then at that point I would continue—or I would consider not making a final decision until after the state has had an opportunity to respond. * * *. If you wanted to go ahead and have somebody begin an evaluation of him, or you could wait and see what Dr. True has to say. He has not given me any indication of what his diagnosis would be,

only indicated that he wanted to give some additional thought to it and conduct some further tests."

After several more days, the court indicated that True's report would be faxed to the court that afternoon and told the prosecutor:

"[Y]ou may wish to have your office take whatever steps necessary. I'll sign an order to have Mr. Cunningham evaluated at the State Hospital on your request pursuant to the statute."

The prosecutor indicated that he had spoken with Dr. Richard Hulteng about possibly evaluating defendant, but he had not wanted to schedule anything until the state received True's evaluation. The court responded, "The only information I have is that Dr. True's recommendation will not be favorable to the state, so I would suggest that you make arrangements to have your own evaluation." Defendant then was evaluated by Hulteng.

Before making a competency determination, the court received two written reports from True and heard testimony from both True and Hulteng. True rendered the opinion that, at a "general or simple level," defendant could aid and assist in conducting the trial, but the situation was complicated by defendant's attempts to represent himself. True indicated that defendant believed that he and his advisors simply had differences of opinions about strategy and that his strategy was to "attack" witnesses in an effort to impeach them rather than take the conservative approach recommended by his advisors. True observed some paranoid thinking but further noted that it could stem either from a mental condition or from the fact that defendant was not liked by the witnesses who were testifying against him at trial.

Based on that preliminary information, True initially thought it likely that defendant was competent to aid and assist in his defense. However, after observing defendant further in the courtroom and further evaluating defendant's tests, True developed the opinion that defendant suffered from a paranoid condition that caused him to seriously misinterpret information. Consequently, True rendered the opinion that, while defendant was substantially able to aid and assist when he was not acting as his own attorney, he

was, for the foreseeable future, "substantially unable to aid and assist in his own defense when acting as his own attorney." When defendant was informed of True's opinion, he refused to cooperate with further evaluation, which True opined was important diagnostic information that was consistent with paranoia. True defined defendant's condition as a persecutory delusional disorder with grandiose features, along with depression.

On the day of the hearing when both doctors were to testify, defendant's attorney-advisors sought an order appointing independent counsel to advise defendant at the competency hearing, on the ground that the attorney-advisors were not in a position to assist him because they were "actively advocating a position contrary to defendant's stated desires and stated interests and over defendant's objection[.]" On the same day, defendant made an oral motion for appointment of independent counsel. The court denied the motions. True presented testimony and was questioned by the court about his conclusions. The court asked defendant if he wished to contest True's finding, and defendant indicated that he did. The court clarified: "So you wish to proceed as your own counsel and be found able to aid and assist?" Defendant responded that he did, but that he would like to have his own independent advisor. Defendant told the court that he would not cross-examine True without the assistance of an independent advisor.

The state then called Hulteng as a witness. Hulteng indicated that he had conducted a clinical interview with defendant and reviewed some 300 to 500 pages of documents, as well as True's test results and notes. According to Hulteng, defendant participated in approximately 80 to 90 percent of the examination, declining to answer certain questions after consulting with his attorney-advisors.

Hulteng drew different conclusions about defendant's condition than had True. He believed that defendant suffered from some depression, probably situational, but that he did not have a delusional disorder. Hulteng rendered the opinion that, while defendant did have a mixed personality disorder with antisocial, paranoid, and narcissistic features and had exhibited maladaptive behavior in the courtroom,

defendant exhibited no psychotic disorder such as a delusional disorder. Hulteng described paranoid personality and delusional disorders as on a continuum, with a suspicious or distrustful person crossing over into psychosis "where belief is so unusual as to defy credibility and has maintained despite consistent feedback from the external environment." Hulteng concluded as to each of the three pertinent legal questions framed by ORS 161.360, *see* 197 Or App at 280 n 11, that defendant understood the nature of the proceedings and was competent to stand trial. The court specifically asked Hulteng about defendant's tendency to bring out information on examination of witnesses that was harmful to his case, and Hulteng responded that, while defendant's conduct was maladaptive and showed poor judgment, it was not delusional.

The trial court ultimately concluded that, although defendant's paranoia interfered with his ability to make wise choices and to understand the merits of his advisors' opinions, those were results of his personality and not of a mental disease or defect. Accordingly, the court determined that defendant was competent to continue to stand trial.

■ On appeal, defendant does not challenge the factual sufficiency of the trial court's ultimate competency determination. That is, he does not contend that this record does not support such a determination. Rather, defendant takes issue with the procedures that the trial court employed—and, particularly, with three purported rulings. First, defendant argues that the trial court erred in denying his motion for an additional "independent" attorney-advisor. Second, he argues that the trial court erred in denying him "consultation with an independent psychologist." Third, defendant argues that the trial court erred in denying him "access to the state's psychologist's report on which the court's competency finding was based." For clarity of analysis, we begin by briefly addressing defendant's second and third arguments and then return to his first.

Contrary to defendant's assertion that the trial court erred in denying "consultation with an independent psychologist," no such ruling ever occurred. Defendant identifies no specific ruling but, instead, refers to an eight-page portion of

the transcript. We have reviewed the transcript. At no point did defendant ask for any consultation with a psychologist. At one point, one of defendant's attorney-advisors stated to the court that he wanted the record to reflect that "we advised [defendant] that he could request that an independent psychologist appointed by the court that he approved or at least someone other than Dr. True, be allowed to interpret both Dr. True's results and Dr. Hulteng's results." However, nothing in the record evinces that such a request was ever made.

In sum, defendant's argument that the court erred in denying his consultation with an "independent psychologist" is not preserved at the location in the record to which he has referred us. *See generally* ORAP 5.45 (appellants must identify precisely the ruling being challenged; the court is not required to search the record to find the error or to determine if the error was preserved). Further, the attorney-advisor's statement that he had advised defendant of a right to an "independent psychologist" cannot be construed as a request that the court appoint such an "independent psychologist." We thus reject defendant's "independent psychologist" argument without further discussion.

Defendant's third argument, that the trial court denied him access to psychological reports, also lacks support in the record. Defendant did make a statement after Hulteng's testimony that he had not seen a copy of Hulteng's report and wanted an opportunity to review it. However, there is no indication in the record that Hulteng ever produced a written report. Defendant did not inquire on cross-examination whether such a document existed, no reference to such a document was made on direct examination, and no exhibit is a part of the record on appeal. On this record, there was no error.

■ We return, then, to defendant's first argument, that he was entitled to an additional "independent advisor" for purposes of the competency hearing. On appeal, defendant argues that the trial court's denial of an "independent advisor" denied him procedural due process under the Fourteenth Amendment to the United States Constitution, because a

"failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Medina v. California,* 505 US 437, 449, 112 S Ct 2572, 120 L Ed 2d 353 (1992) (quoting *Drope v. Missouri,* 420 US 162, 173, 95 S Ct 896, 43 L Ed 2d 103 (1975)).

Defendant's argument appears to be unique. We are unaware of any precedent in Oregon, or elsewhere, for the proposition that, where a criminal defendant is representing himself or herself with the assistance of attorney-advisors and those advisors have informed the court of their belief that the defendant is incompetent, the defendant is constitutionally entitled to the appointment of additional "independent counsel" to also advocate, over the defendant's objections, that the defendant is incompetent. Moreover, defendant's present position is fraught with contradictions. For example, defendant explicitly asserts in his opening brief on appeal that due process required that he be afforded "counsel to ensure a reasonable opportunity to demonstrate his *in*competence." (Emphasis added.) However, at trial, defendant took the position that he *was competent* to stand trial, while his attorney-advisors took the position that he was not. Thus, defendant's request at trial for an "independent advisor" was for someone who (contrary to his existing legal advisors' view) would assist him in establishing that he *was competent*.

This problematic situation was further complicated by the fact that defendant was representing himself rather than presenting his case through counsel. We have no doubt that defendant's attorney-advisors found themselves in an awkward situation. However, despite their difficult position, the attorney-advisors sufficiently alerted the court to their concerns to prompt the court to invoke ORS 161.365, which requires a court that has reason to doubt the defendant's fitness to proceed at trial to obtain a psychiatric or psychological evaluation of the defendant. If either party takes issue with the finding of the psychiatric or psychological report ordered by the court, that court is required to hold a hearing on the matter. ORS 161.370(1). At the hearing, the party contesting the finding may cross-examine the psychiatrist or

psychologist who prepared the report, and either party may adduce further evidence. *Id.*

The court in this case followed the procedures set forth in the statutes. The state contested the finding of the psychological report and presented its own evidence in the form of Hulteng's testimony. Both the state and defendant were given the opportunity to cross-examine True. Defendant was given the opportunity to, and did, cross-examine Hulteng. It is difficult to see how yet another attorney-advisor for defendant could have ensured additional procedural fairness under these admittedly unusual circumstances. As noted, the attorney-advisors already appointed asserted that defendant was not competent; defendant's purported need for an additional "independent advisor" was because of his difference of opinion with the attorney-advisors on that issue. Had the court appointed an additional advisor for defendant who agreed with defendant and disagreed with the other attorney-advisors, that advisor necessarily would have been advocating that defendant *was* competent. However, that is exactly what the state was advocating—and that is how the court ultimately ruled. Viewed in that light, it is difficult to see how the failure to appoint someone to argue the position that the court ultimately accepted could constitute reversible error.

Defendant relies on several decisions from the United States Supreme Court in support of his argument that due process required the appointment of a third attorney-advisor under these circumstances. We find none of them to support defendant's contention. In *Medina,* the question presented was whether a state statute that placed the burden on a criminal defendant to prove by a preponderance of the evidence that he was not competent to stand trial violated due process. 505 US at 439. The Court held that it did not:

"[W]e cannot say that the allocation of the burden of proof to a criminal defendant to prove incompetence 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' "

*Id.* at 446 (quoting *Patterson v. New York*, 432 US 197, 202, 97 S Ct 2319, 53 L Ed 2d 281 (1977)). In reaching that result,

the Court noted that, at a competency hearing, a defendant is entitled to assistance of counsel. *Id.* at 450. The Court stated:

> "Although an impaired defendant might be limited in his ability to assist counsel in demonstrating incompetence, the defendant's inability to assist counsel can, in and of itself, constitute probative evidence of incompetence, and defense counsel will often have the best-informed view of the defendant's ability to participate in his defense. While reasonable minds may differ as to the wisdom of placing the burden of proof on the defendant in these circumstances, we believe that a State may take such factors into account in making judgments as to the allocation of the burden of proof, and we see no basis for concluding that placing the burden on the defendant violates the principle approved in *Pate* [*v. Robinson*, 383 US 375, 384-85, 86 S Ct 836, 15 L Ed 2d 815 (1966) (a defendant does not knowingly and intelligently waive his right not to be convicted while incompetent to stand trial by failing to request a competency hearing; where evidence raises a bona fide doubt as to a defendant's competence to stand trial, the court must conduct a competency hearing *sua sponte*).]."

*Medina*, 505 US at 450-51 (citations omitted).

 ˙ From those cases, we know that, when a criminal defendant's competence to stand trial is in doubt, the trial court has an obligation to hold a competency hearing. *Pate*, 383 US at 385. It is not disputed that at such a hearing—and regardless of how burdens of proof are allocated[12]—a defendant is entitled to the assistance of counsel. We assume, at least for purposes of this case, that a defendant attempting self-representation is entitled to "assistance of counsel" in the form of an attorney-advisor in a situation such as this. In *Medina*, the Court recognized that the "assistance of counsel" can be somewhat problematic under circumstances such as these, given that "an impaired defendant might be limited in his ability to assist counsel in demonstrating incompetence[.]" *Medina*, 505 US at 450. But, as noted, the very disagreement between a defendant and his counsel may provide evidence for the competency determination. *Id.*

---

[12] The Oregon statutory scheme does not allocate any burden to a criminal defendant in these circumstances. *See* ORS 161.360 to 161.370.

Where a criminal defendant is at odds with counsel because counsel believes that the defendant is not competent, while the defendant believes that he or she is competent, the dilemma cannot be resolved simply by substituting new counsel for old,[13] or by appointing additional lawyers to represent the defendant. That is so because any newly appointed lawyers who argued in support of *in*competence would be in exactly the same position as the previous lawyers; they would be taking a position with which their client disagreed. In short, under these circumstances, a newly appointed attorney-advisor would be in no better position to assert the incompetency position than were the already appointed attorney-advisors. On the other hand, any new attorney-advisor who argued, per the client's wishes, that the client *was* competent to stand trial would not be protecting the client's due process right not to be tried if incompetent. Due process does not require the appointment of additional counsel to argue that a criminal defendant's rights are *not* being violated simply because the defendant disagrees with his counsel's arguments that his rights *are* being violated.[14]

The procedures followed here were adequate to ensure that defendant was competent to stand trial. The trial court held the competency hearing despite defendant's assertions that he was competent to stand trial. The trial court employed a neutral psychologist to provide a report and provided both parties an opportunity to question that neutral psychologist. The trial court further afforded the parties an opportunity to present their own evidence on the subject and to examine witnesses.[15] The court heard expert testimony from two witnesses—one who concluded that defendant was incompetent to stand trial and the other who concluded that defendant was competent. Thus, the court was presented with evidence to support either position and was able to use

---

[13] Defendant did not request that his attorney-advisors be discharged over this disagreement; he only wanted an additional attorney-advisor.

[14] To the extent that defendant may be suggesting on appeal that it is not so much an additional attorney-advisor *for him* that was required, but an "independent" cross-examiner appointed by the court to advocate for the "incompetency *position*" regardless of defendant's wishes, that argument is unpreserved and we do not consider it.

[15] As noted above, defendant did not request an additional examination.

those expert opinions, as well as the court's own observations of defendant's courtroom behavior and difficulties with his attorney-advisors, in making its competency determination. Due process requires nothing more.

Defendant's remaining assignments of error do not require discussion.

Affirmed.