LINDER, S. J.
*842 Defendant appeals from a judgment of conviction on one count of unlawful sexual penetration in the first degree, ORS 163.411 (Class A felony), and seven counts of sexual abuse in the first degree, ORS 163.427 (Class B felony). Defendant's assignments of error frame two main issues on appeal.[1] One issue *388 is whether OEC 803(18a)(b), the hearsay exception for statements concerning sexual abuse, extends to double hearsay-that is, a statement by a victim to one person, who reports the statement to a second person, who then relates the victim's statement at trial. The second issue is whether defendant established that, because of cognitive deficits that were diagnosed after trial, he was not competent to be sentenced or to stand trial. For the reasons we explain below, we affirm.
I. FACTUAL AND PROCEDURAL BACKGROUND
We begin with a summary of the evidence at trial and the procedural events that gave rise to the issues on appeal. In our analysis of the hearsay and competency issues raised on appeal, we provide added factual and procedural details that have particular relevance to those discrete issues.
Defendant was charged with a total of eight sexual offenses committed against three girls. Two of the girls (KLM and SAM) are twin sisters; the third (KCH) is their older cousin. Defendant is their uncle. The victims were between five and nine years old when the crimes were committed, which occurred over a period of years and involved multiple, isolated incidents of sexual touching. The victims' allegations did not come to the attention of law enforcement authorities until several years after the abuse ended. By the *843 time of trial, KCH was 24 years old; the twins were 16 years old; and defendant was 80 years old.
Each of the three victims testified at trial and gave their first-hand accounts of defendant's sexual contacts with them. According to KCH, when she was about eight or nine years old, while defendant and his wife were babysitting her for the day, defendant took her to an upstairs bedroom, sat her on the bed, lifted her skirt, and began to rub his hand above her vagina, while asking her if what he was doing "felt good." KCH's memory of that touching was vivid. She also remembered other times when defendant touched her inappropriately, but by KCH's own account, those other memories were fainter and more indistinct.[2] The twins, KLM and SAM, testified to sexual touching by defendant that began when they were between about five and seven years old and stopped around third grade. In particular, KLM recalled times when defendant fondled her buttocks while greeting and hugging her. Both twins also described their memories of inappropriate touching by defendant when he would go swimming with them. KLM remembered how defendant would touch her vagina and her buttocks, both underneath her swimsuit and over the top of it.[3] SAM likewise remembered defendant touching her vaginal area, but only over the top of her swimsuit. Finally, SAM also remembered several other sexual contacts by defendant in his home when she and KLM were being babysat by defendant and his wife. As to those contacts, SAM remembered that once, while she was with defendant in a bedroom, defendant put lotion on her legs and touched her vaginal area with his hand. Another time, while SAM was with defendant in the living room, defendant had SAM touch his penis with her hand and move her hand while he watched a pornographic video on TV. SAM also remembered, on a different occasion when *844 she was with defendant in the living room, that defendant touched her vagina with his hand and penetrated her vagina with his finger.[4] *389 The victims each described feeling traumatized and confused by defendant's sexual contacts with them, and were reluctant to tell anyone about the abuse. While still in grade school, KCH confided in a few friends and cousins, telling them that her uncle (defendant) was a bad person, and sometimes saying that he had molested her, without describing the details of the abuse. Towards the end of high school, KCH finally told her mother that defendant had abused her when she was younger, again without giving details, but her mother (defendant's sister-in-law) insisted that KCH not tell anyone. The twins both testified that they confided in each other after the abuse began, sometimes crying together at night; but they did not tell each other details. KLM's father testified that, once, after KLM came home from defendant's house upset and crying, one or both of the twins told him that that they were not comfortable around defendant because he touched them on their butts; KCH also said that defendant touched her "on the front too," which her father understood to mean between her legs. Their father got upset, told their mother (his then-wife and another of defendant's sisters-in-law), and threatened to confront defendant. But, according to the twins' father, their mother insisted that the conduct was not "that bad" and stopped him. Their mother did, however, call KCH, tell her what KLM had said, and ask KCH if defendant had done anything like that to her. KCH testified that, when she answered yes, the twins' mother told her not to talk about it.
Although defendant's alleged abuse of KCH stopped when she was about nine years old, she testified that various things would "trigger" her memory, causing her to have *845 traumatic "flashbacks" of defendant touching her vaginal area in the upstairs bedroom. A grade-school friend, who also had briefly been KCH's boyfriend in college, testified that he witnessed KCH go through those traumatic reactions well into her college years. After college, while in graduate school, KCH began seeing a psychotherapist to deal with having been abused when she was young. During that time, KCH decided to bring defendant's abuse to the attention of authorities, which led to KCH being interviewed by a detective.[5] As part of the investigation, the detective recorded a phone call between KCH and defendant in which KCH confronted defendant about his abuse of both her and KLM; defendant denied the allegations. The detective also interviewed KLM, who had difficulty talking about the abuse, but described defendant's fondling and groping during hugs and while swimming; KLM also suggested that SAM may have been abused. The detective interviewed the twins' mother, who confirmed that one of the twins had made a limited disclosure of the abuse to their father several years before.
The detective's investigation resulted in referring the twins for CARES interviews and physical examinations.[6] Each of the twins was individually interviewed; each interview lasted about 45 minutes and was video recorded. The videos were played in full at trial for the jury as substantive evidence. The twins' statements to the CARES interviewer about defendant's sexual contacts paralleled the substance of their testimony at trial. The videos also permitted the jury to observe the twins' demeanor during the interviews, their difficulty talking about the abuse, and how the interviews were conducted.
*846 Numerous other witnesses also testified. The state presented several witnesses *390 (friends, family members, and KCH's psychotherapist) who corroborated the disclosures that the victims had made over the years as well as other corroborating circumstances, such as the victims' discomfort around defendant, and, in KCH's case, the traumatic flashbacks that she experienced. Defendant's case focused on impeaching the victims' credibility by cross-examining the victims and the corroborating witnesses in an attempt to expose inconsistencies in the statements that the victims had made over time, inherent weaknesses in their accounts of events, and other circumstances that arguably undercut the victims' and the state's other witnesses' believability (such as bias due to intrafamily tensions). By way of an affirmative case, defendant presented character witnesses who testified that defendant was sexually appropriate around children; his wife, who testified that, when she and defendant babysat the victims, none of the victims was ever out of her sight or alone with defendant; and the twins' mother, who testified that the twins were lying about the abuse.[7]
At the conclusion of the trial, the jury returned guilty verdicts on each of the eight counts. Before sentencing, defense counsel moved to have the court determine defendant's fitness to be sentenced, asserting that defendant had undergone cognitive decline that called his competency into question. At a hearing on the motion, the court was presented with the opinions of two experts who had examined defendant and agreed that he had a mild neurocognitive disorder (i.e. , dementia ) that caused him some degree of memory impairment. The experts reached opposite conclusions, however, on whether defendant's cognitive deficits rendered him incompetent to be sentenced. After weighing the experts' competing opinions and other relevant evidence, the trial court determined that defendant was competent for sentencing purposes. The trial court then sentenced defendant to 124-months' imprisonment and 20-years' post-prison supervision.
*847 After sentencing, defendant moved for a new trial based on newly discovered evidence of defendant's neurocognitive disorder which, defendant asserted, had rendered him incompetent at the time of trial. At the hearing on the motion, the earlier record on defendant's competency to be sentenced was made part of the record on the motion for new trial; defendant also offered further evidence in support of his motion. At the end of the hearing, the trial court denied the motion for new trial, finding that defendant did not carry his burden to establish that he had not been competent at the time of trial. The trial court then entered judgment against defendant, and defendant brought this appeal.
II. DOUBLE HEARSAY
As described above, during its case-in-chief, the state called several witnesses to testify to disclosures that the victims had made about defendant's sexual contacts. Before trial, the state gave notice that it would be introducing those various hearsay statements pursuant to OEC 803(18a)(b), which allows into evidence hearsay statements "concerning an act of abuse," including acts of "sexual abuse" and "rape of a child, which includes but is not limited to rape, sodomy, unlawful sexual penetration and incest." See id. (incorporating definition of "abuse" under ORS 419B.005 ). With one exception, the evidence of the victim's several disclosures came in at trial without objection.
The exception occurred during the testimony of the twins' father. He principally testified about the disclosure that, as we earlier described, one or both twins made to him when they were young, after KLM had come home from defendant's house crying and upset during the time that the abuse was on-going. Although the twins' mother stopped him from confronting defendant, their father made sure that the twins never stayed at defendant's home again after that. The twins' father explained that the disclosure that the twins had made to him when they were young was the last that he heard about defendant's touching of the twins "for a bunch of years."
*391 The state then asked the twins' father whether he heard anything more in the months before trial about *848 defendant's sexual touching of the twins. He answered that, "when this whole case developed," KLM called to tell him that the twins were going to talk to an investigator about what defendant had done to them years before. The prosecutor then asked, "when [KLM] told you what had happened with [defendant] did she explain to you anything that had happened to [SAM] as well?" Defense counsel objected on hearsay grounds. When the prosecutor cited OEC 803(18a)(b), the trial court commented that the statement would be "double hearsay." The prosecutor replied:
"Sure. But it doesn't matter. It's still 803(18a)(b), statements concerning an act of abuse. [KLM]'s statements are statements concerning an act of abuse. [KLM] is testifying to someone who's saying statements concerning acts of abuse. So the double hearsay is covered by 803(18a)(b)[.]"
At that point, the trial court overruled the objection and the prosecutor asked, "what did [KLM] say that [SAM] had said about the abuse?" The twins' father answered:
"Yeah. Well, when I first got that call, you know, she said about [what defendant] did a bunch of years ago.
"And I said, 'well as far as I understand it, it was kind of like when he gives you hugs, he kind of gave you pats on the butt, you know, or maybe he pinched you or something like that,' because I never heard the details. * * *.
"And I said, 'well, you know, as far as I knew, that's what happened.'
"And she goes, 'no. It was a lot worse,' you know, she goes, 'he raped [SAM],' you know.
"And I said, 'well, what do you mean raped,' you know.
"And she just [said], 'well, he raped her,' and that's all she said, you know. She didn't tell me any of the details at that time."
The twins' father explained that he "didn't clarify what to [KLM] rape means" because he "didn't want to put her through any more trauma than [he] had to."
On appeal, defendant renews his challenge to that testimony, and the state renews its defense of its admissibility. In the course of their arguments, the parties dispute *849 several issues: (1) whether defendant adequately preserved his "double hearsay" challenge; (2) whether the challenged statement was in fact "double hearsay"; and (3) whether OEC 803(18a)(b) is limited to first level hearsay (i.e. , B's testimony that A told B about abuse that A saw or experienced) or extends to any statement concerning an act of abuse, including multiple levels of hearsay (i.e. , C's testimony that A told B who told C about abuse that A saw or experienced). Finally, the parties dispute whether, if admission of the challenged testimony was error, it was harmless. Because we conclude that any error in admitting the challenged statement was harmless, we do not reach the other issues that the parties debate.
A defendant seeking a reversal based on a claim of evidentiary error has the burden to show some likelihood that the challenged evidence affected the verdict. State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003) ; OEC 103(1) (evidentiary error is not presumed to be prejudicial). In assessing whether erroneously admitted or excluded evidence affected the verdict, we consider the nature of the evidence in the context of the trial as a whole. Davis , 336 Or. at 33-34, 77 P.3d 1111. We therefore review all portions of the record, not just the evidence most favorable to the state. State v. Maiden , 222 Or.App. 9, 11, 191 P.3d 803, rev. den. , 345 Or. 618, 201 P.3d 909 (2009). Among other factors, we consider whether the evidence was cumulative of other evidence admitted without objection, which includes assessing any differences in the quality of the erroneously admitted or excluded evidence as compared to the other evidence on the same issue. Id. at 13-14, 191 P.3d 803 ; see also State v. Norby , 218 Or.App. 609, 620, 180 P.3d 752 (2008) (when several witnesses testify to the same effect, the erroneous admission of one witness's testimony often will be harmless; role and status of witnesses, however, must be considered). We also consider how the case was tried and *392 the extent to which the disputed evidence was or was not emphasized by the parties and central to their theories of the case. Maiden , 222 Or.App. at 14, 191 P.3d 803 (discussing factors); State v. McKinzie , 186 Or.App. 384, 396, 63 P.3d 1214, rev. den. , 336 Or. 16, 77 P.3d 319 (2003) (considering extent to which proffering party relied on evidence at trial). *850 In this case, because there were no witnesses to defendant's sexual contacts with the victims, and because none of the victims suffered physical trauma or injury, the dispute reduced to whether the jury believed the victims. Under the parties' respective approaches to that central issue, the credibility of the older cousin, KCH, was particularly pivotal. As the state cast her, KCH was the "one person" who was "willing to lift the veil" and was "brave enough to undergo the fear, the sadness, the isolation and the pain" of stepping forward to report what defendant, her uncle, had done. With the veil lifted, the twins' allegations of abuse surfaced too. In contrast, as the defense cast her, KCH was a "steamroller" out to "bury" defendant. The twins were merely KCH's pawns: KCH had "recruited her two young cousins" to make false allegations about events that they claimed occurred so many years before that defendant could not easily respond to them.
The trial was hard fought. The jury sat through five days of court proceedings, observed first-hand the direct testimony and extensive cross-examination of all three victims, watched nearly two hours of videotaped CARES interviews, listened twice to the 17-minute-long recorded phone call between KCH and defendant, and heard the testimony of 15 other witnesses. Other than the few sentences it took for the twins' father to relate what KLM said in her brief phone call to him about the "worse" thing that defendant did to SAM-viz. , that KLM said defendant had "raped" SAM, but she did not explain what she meant by rape and her father was not willing to press her to further explain-the jury heard nothing more about that evidence.
Instead, the prosecutor's credibility argument focused foremost on the substance of KCH's testimony and the genuineness of her emotions on the stand, together with the many things that corroborated her allegations, such as her partial disclosures to friends and relatives in grade school and high school, the traumatic flashbacks that she had endured for years, which others, including her psychotherapist, had witnessed; and her lack of a motive to fabricate her allegations. The prosecutor similarly emphasized the substance of the twins' descriptions of defendant's abuse, both from their testimony on the stand and their corroborating CARES
*851 interviews; the genuineness of their difficulty talking about the abuse, both during their testimony on the stand and during the corroborating videotaped CARES interviews; their corroborating disclosures to each other when they were young; and the disclosure that one or both twins made to their father when they were about eight years old. The prosecutor did not so much as mention, let alone specially rely on, KLM's phone call to her father a few months before trial, when she was about to be interviewed by an investigator.
Neither did the defense bring up that phone call or KLM's statement during the trial. Defense counsel focused principally on KCH, highlighting how her "story evolved with the questioning," expanding to an "indefinite number" of claimed instances of sexual abuse. Defense counsel acknowledged that he could not identify a "specific" motive for KCH's allegations, but he could say, and he urged that the jury could observe from KCH's demeanor and testimony, that she was "in fact, motivated," "clearly ha[d] an axe to grind here" and wanted defendant convicted. As for the twins, defense counsel emphasized their "troubled family life" and how "nice" it must have been for them to have an older cousin "pay attention to them," be a "support system" for them, and tell them that their emotional problems were defendant's fault. Defense counsel urged that the jury could see from the twins' testimony on the stand that they "appear[ed] to have been a little staged." For all three victims, defense counsel highlighted aspects of their testimony that, defense counsel maintained, were internally inconsistent, inconsistent with other evidence, or made their testimony *393 inherently improbable. Defense counsel urged the jurors to rely on "what you saw from the witness stand," the "manner" in which KCH, KLM, and SAM testified, the "nature and quality" of their testimony, and the inconsistencies and contradictions in what they had said.
As that description of the trial reveals, both the state and the defense relied on a vast array of circumstances to either bolster or detract from the victims' credibility. The fact that the victims made prior consistent disclosures was relevant to their credibility, and the challenged testimony was one such disclosure. But it was only one of many. Each *852 victim made other corroborating statements at other times. In particular, all three victims made earlier disclosures to a parent; KCH and KLM made earlier disclosures to the detective; the twins both made detailed and extensive disclosures to the CARES interviewer; and KCH made early disclosures to friends and cousins, and then later and on-going disclosures to her psychotherapist. KLM's disclosure in the telephone call to the twins' father was cumulative of the numerous other corroborating disclosures by the three victims that came into evidence without objection.[8]
The challenged testimony had little likelihood to have affected the verdict in a second, equally important sense: It was a never-again-mentioned item of evidence in a five-day trial focused entirely on whether the jury should believe the victims' claims. Neither party brought up KLM's pretrial phone call to her father at any later point in the trial-not with the victims themselves, or in argument to the jury. See State v. Irons , 162 Or.App. 512, 526, 987 P.2d 547 (1999), rev. den. , 330 Or. 120, 6 P.3d 1097 (2000) (inadmissible polygraph evidence was not prejudicial where reference was isolated and innocuous, and prosecutor did not later rely on it); see also State v. Mendoza-Sanchez , 291 Or.App. 299, 314-15, 419 P.3d 765 (2018) (assessing prejudice of erroneously admitted evidence in part based on parties' reliance and use of evidence in closing arguments). Both parties emphasized instead how the jury should assess the victims' credibility based on the substance of their in-court testimony in combination with their demeanor and manner on the stand.[9] That much, alone, gave the jury an ample basis on which to assess their credibility, despite any possible error in admitting KLM's isolated out-of-court statement to her *853 father about the "worse" thing defendant did to SAM. See State v. Hobbs , 218 Or.App. 298, 309, 179 P.3d 682, rev. den. , 345 Or. 175, 190 P.3d 1237 (2008) (admission of victim's hearsay statements was harmless where statements were "cumulative of [the victim's] testimony"). In addition to the victims' in-court testimony, the other evidence admitted during the trial-e.g. , the other corroborating prior disclosures, the videotaped CARES interviews, the audio recording of the 17-minute telephone call between KCH and defendant, and the various facts and circumstances related by the other 15 witnesses who testified during the trial-all was relevant to whether the jury should believe the victims' claims. In the context of this record, the challenged hearsay evidence simply had no realistic likelihood of affecting the jury's verdict where, as here, the parties did not rely on that evidence and there was a volume of other evidence from which the jury could make the credibility determination.
Defendant does not dispute the existence of the victims' other corroborating disclosures or the volume of evidence bearing on the victims' credibility more generally. Defendant urges, however, that the challenged *394 hearsay was particularly strong corroboration of SAM's allegations, because "it was an emotional, passionate, assertion" of serious sexual abuse, unlike the reluctantly-voiced and limited disclosures that the twins had made to each other and to their father when they were younger. To the extent that defendant, in making that argument, invites us to weigh the statements that KLM made in her telephone call to her father more heavily because of some perceived "emotional" or more forthright way in which KLM communicated with her father, that is not our role. State v. Miskell , 351 Or. 680, 699, 277 P.3d 522 (2012) (court does not weigh evidence in determining harmless error).
It is our role, however, to assess qualitative differences in evidence admitted on the same issue. State v. Chandler , 278 Or.App. 537, 541, 377 P.3d 605, rev. den. , 360 Or. 568, 385 P.3d 82 (2016) (in assessing harmlessness, "we consider any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue"). If defendant's point is that KLM's statement to her father was of distinctive quality, so that rational jurors would *854 more likely believe that evidence over the other corroborating disclosures that were admitted without objection, we disagree. Instead, the opposite is true. The challenged hearsay related KLM's spontaneous, cursory, and unexplored statement about SAM's abuse in a brief phone call to her father. The jury also had the evidence of SAM's video-recorded CARES interview, in which SAM had described in detail the precise conduct to which defendant subjected her. That prior disclosure not only corroborated SAM's in-court testimony, but provided the jury with a direct means of assessing SAM's credibility by observing firsthand her demeanor and the manner in which the interview was conducted.
In urging that the challenged testimony was prejudicial, the dissent takes a different tack. The dissent characterizes KLM's statement to her father as an allegation of an uncharged crime or other bad act-i.e. , the crime of rape, not a disclosure corroborating the charge of unlawful sexual penetration. 294 Or.App. at 881- ----, 433 P.3d at 409- ---- (Shorr, J., dissenting). There are at least two problems with the dissent's position.[10]
First, contrary to the dissent's assertion, in the context of this trial, it is highly unlikely the jury would have understood the challenged testimony to be an allegation of an additional, uncharged allegation of rape. All but one of defendant's contacts with the three victims involved defendant touching intimate areas of their bodies (their vaginas or buttocks) or, in one instance, causing SAM to touch defendant's penis. Those contacts resulted in charges of first-degree "sexual abuse," a Class B felony. But the final charge was significantly different and distinctive. It was a charge of a Class A felony: first-degree "unlawful sexual penetration" committed when defendant allegedly "penetrat[ed] the *855 vagina of [SAM], a person under the age of 12 years, with an object to wit: a finger." And that is what SAM, via her testimony on the stand and her statements to the CARES interviewer, consistently claimed: Defendant used his finger to penetrate her vaginally.
The record does not reveal whether KLM resorted to the word "rape" to describe that act of abuse, or whether SAM used it first and KLM repeated it. Either way, "rape" was a natural word for them to use to describe the conduct on which the unlawful sexual penetration charge was based. As a matter of ordinary usage, rape can encompass a broad range of unlawful sexual activity, especially activity involving sexual penetration through some means.[11] Legally, that *395 is true as well: The crime of rape often includes any sexual penetration (anal or vaginal), regardless of the means used to accomplish the act.[12] And in Oregon, "rape" of a child for purposes of the child abuse laws explicitly includes the crime of "unlawful sexual penetration." ORS 419B.005. In this case, none of the victims readily or easily could talk about what defendant had done to them, and none was comfortable *856 using graphic language.[13] Given their discomfort, resort to the word "rape" to articulate the "worse" thing that defendant did to SAM-much worse than patting the twins on their butts-was a natural and understandable (as well as legally correct) way to convey the physically invasive sexual contact that SAM suffered.
Significantly, there is no reason to think that the jury was misled by KLM's use of the term. The twins' father testified that he did not know-and did not press KLM to explain-what she meant by "rape." After he gave that testimony, the jury watched the video-recorded CARES interviews. As part of SAM's interview, after SAM disclosed that defendant had made SAM touch his "private" (meaning defendant's penis) while he watched a pornographic video, the CARES evaluator was careful to ask her: "Did anything else happen with his private?" SAM answered: "No." The jury also observed SAM on the stand and heard her describe defendant's sexual contacts with her. SAM described only defendant's act of using his finger to touch the "inside part" of her body (i.e. , her vagina). She did not claim that defendant at any time touched or penetrated her vaginally with his penis. Given the totality of the evidence, there is no reason to believe that the jury in this case would have assumed that KLM's disclosure to her father was an additional allegation of an uncharged act of rape, one that was never raised or discussed again in the trial. Instead, the jury reasonably would have understood KLM's use of the term "rape" in her brief telephone call to her father to be what it was-a natural term for a child to use for the unlawful sexual penetration act that defendant was charged with having committed.[14]
*396 *857 The second problem with the dissent's position is the nature of the prejudice that the dissent identifies from its view of the challenged hearsay evidence. The dissent asserts that, although the jury might have concluded that KLM's statement in the telephone call to her father was cumulative of the evidence of the charges against defendant, the jury might also have concluded that, "if defendant had 'raped' SAM, it was more likely that he had committed the charged acts of sexual abuse." 294 Or.App. at 884, 433 P.3d at 410 (Shorr, J., dissenting). In other words, the dissent's concern is that the evidence might have (but also might not have) been understood by the jury to be evidence of an uncharged crime of rape, and if so understood, the jury might have drawn a propensity inference by viewing defendant as someone likely to commit sexual crimes against children. See State v. Baughman , 361 Or. 386, 403-05, 393 P.3d 1132 (2017) (discussing nature of prejudice that often outweighs probative value of other crimes evidence).
Again, we do not agree that the jury would have understood the challenged testimony to be a claim that defendant had committed an uncharged crime of rape. But even if the jury might have understood that to be the import of the testimony, the dissent essentially announces a per se rule that would apply in any case in which a related prior bad act or uncharged crime erroneously comes into evidence during trial. That is not the standard that we apply, however. Because prejudice is not presumed for an evidentiary error, OEC 103(1), the required showing of some likelihood that the evidence affected the verdict must be made in light of the facts and circumstances of the particular case before us.
Here, from the evidence properly admitted during the trial, the jury could conclude that defendant committed multiple unlawful sexual crimes against three young *858 victims over the span of several years. Many of defendant's alleged sexual contacts with the victims-such as those while swimming with KLM and SAM-were repeated, but indistinguishable in time and place, acts that resulted in only a single charge. The eight charges brought against defendant, therefore, were representative of many other unlawful sexual contacts with these three victims that also came into evidence. KCH, moreover, testified without objection to several uncharged sexual contacts by defendant that had surfaced in her memory as she went through therapy. Thus, the admissible evidence in the record provided a basis for the jury to conclude, independent of the challenged hearsay statement, that defendant had a propensity to commit acts of child sexual abuse. In that sense, any propensity inference that the jury might have drawn from the challenged hearsay testimony was at most duplicative. The dissent's analysis provides no persuasive basis to conclude that the challenged evidence, if admitted erroneously, was prejudicial.
We therefore agree with the state that, given the context of the entire trial and the theories on which the case was tried, the challenged statement was cumulative and added nothing of distinctive material value to the jury's assessment of the victims' credibility. On this record, we conclude that there was no likelihood that the challenged evidence affected the verdict on any one, let alone all eight, of the convictions that the jury returned.[15] Assuming without deciding *397 that the challenged hearsay testimony was not admissible, its admission was harmless.
III. COMPETENCY
We turn to whether the record establishes that defendant was not competent to be tried or sentenced. As we *859 described earlier, after the jury returned its guilty verdicts, but before sentencing, defense counsel moved to have the court determine defendant's competency to be sentenced. The trial court determined that defendant was competent, and then proceeded with sentencing. About one month after sentencing, defendant moved for a new trial, arguing that the evidence of defendant's cognitive deficits was newly discovered, and would have changed the outcome of the trial because it demonstrated that defendant had not been competent at the time he was tried. The trial court denied that motion.[16]
Defendant challenges both rulings. We consider first the trial court's denial of the motion to declare defendant incompetent for sentencing, because procedurally that motion came first and the evidentiary record developed on it was incorporated into the later proceedings on the motion for new trial. We then turn to the trial court's ruling on the motion for new trial.
A. Defendant's Competency to be Sentenced
1. Additional procedural and factual background
About two months after defendant's trial had concluded, while working with defendant to prepare for sentencing, defense counsel became concerned that defendant, by then age 81, "had started" to deteriorate cognitively. Defense counsel therefore asked Dr. Trayci Dahl, a forensic psychologist, to assess defendant's cognitive functioning. Dahl concluded that defendant was in the early stages of dementia (clinically, "mild neurocognitive disorder") and had memory impairments as a result. At defense counsel's request, two months after Dahl's initial assessment and about four months after the trial, Dahl further examined defendant to assess his competency for purposes of proceeding with *860 sentencing. Dahl concluded that defendant, due to his memory impairments, was not able to understand the nature of the proceedings against him, to assist his attorney, and to participate in the sentencing proceeding.
Based on Dahl's evaluation, defense counsel asked the trial court to order the Oregon State Hospital (OSH) to evaluate defendant's competency to be sentenced. As earlier described, at the trial court's request, OSH agreed to perform a competency evaluation, which was done by Dr. Jerome Gordon. Gordon agreed with Dahl that defendant had memory impairments due to a "mild neurocognitive disorder" (i.e. , dementia ).[17] Gordon came to a different conclusion, however, on defendant's competency to proceed. In Gordon's opinion, defendant's cognitive deficits did not prevent him from being able, at the minimum level required for legal competency, to understand the sentencing proceedings that he was facing, to assist and cooperate with counsel, and to participate as appropriate at sentencing.
In its ruling, the trial court expressly found that "Dahl's psychological testing" was valid, and that defendant "currently suffers from a mild neurocognitive disorder, unspecified." The trial court then noted: "I'm not *398 going to make very many comments, but I will say the Court was actually a little bit surprised at how strong the defendant's understanding is of the role of parties, the role of judges, [and] the dynamics of sentencing."[18] Beyond that, the trial *861 court expressly found that, "[t]o the degree that the two experts part ways in their methods and analyses, the Court finds the state's expert more persuasive." After making that finding, the trial court announced its determination that defendant was "fit to proceed for a sentencing."
2. The legal standard for competency to proceed
In challenging the trial court's competency ruling, defendant raises a threshold question that presents us with a purely legal issue: whether the trial court applied the correct legal standard in determining that defendant was competent. Defendant relies on the standard set out in ORS 161.630, which provides:
"(1) If, before or during the trial in any criminal case, the court has reason to doubt the defendant's fitness to proceed by reason of incapacity, the court may order an examination in the manner provided in ORS 161.365.[19 ]
"(2) A defendant may be found incapacitated if, as a result of a qualifying mental disorder, the defendant is unable:
"(a) To understand the nature of the proceedings against the defendant; or
"(b) To assist and cooperate with the counsel of the defendant; or
"(c) To participate in the defense of the defendant."
In defendant's view, the trial court declined to apply the fitness standard set out in subsection (2) based on the court's interpretation of subsection (1) as authorizing court-ordered fitness evaluations only "before or during the trial," rather than for sentencing. The trial court then "compounded its error," according to defendant, by applying a "lesser" legal standard than federal due process requires *862 for determining fitness to proceed at trial. In response, the state urges that whether the statute applies to sentencing "is of no moment" because the court applied the federal due process standard, which does not differ in any material way from the statutory standard. The real source of defendant's complaint, the state asserts, is that the trial court tailored the standard to the specific proceeding to be held-here, a sentencing hearing.
We agree with the state's description of the trial court's ruling. In making its competency ruling, the trial court began by explaining that it saw no meaningful distinction between the state and federal law standards for fitness to proceed in a criminal case. The trial court did, however, find greater guidance in the reported federal cases, and it therefore drew from those cases to determine the standard that should apply. The court identified a three-part legal test that it would use to determine defendant's competency to be sentenced:
"Number one, does the defendant possess a present ability to consult with his attorney with a reasonable degree of rational understanding to the extent that understanding and participation are called for in a sentencing hearing[?]
"* * * * *
*399 "Number two, does the defendant have a rational understanding of the proceedings to the extent that understanding and participation [are called for] in a sentencing hearing?
"And, number three, does the defendant have a factual understanding of the proceedings to the extent that understanding and participation are called for in a sentencing hearing?
"This is a lesser standard [than] the legal test for fitness to proceed at trial."
We understand the trial court to have concluded that the state and federal standards were materially the same, with the result that the court did not have to choose between them. That is consistent with the arguments that the parties made to the trial court at the hearing. Defense counsel argued that the federal and state standards were *863 "substantially similar" and relied on federal cases in arguing that defendant was not competent to be sentenced. The state urged that the statute appeared to codify the federal standard; the state, too, principally relied on federal case law. In addition, both experts testified that they followed both the federal standard and the standard in ORS 161.360(2), suggesting that the standards were not meaningfully different for purposes of their evaluations and conclusions. The trial court approached the issue the same way-with the understanding that the statute and federal law were sufficiently parallel that it was not necessary to distinguish between them in making the competency determination.[20]
The question, then, is whether the trial court applied the correct legal standard. As the parties and the trial court alike observed at the hearing, state case law provides no guidance on how the competency standard in ORS 161.360 applies in the context of sentencing. Federal law, however, seems well-settled. The minimum competency standard-the one required by federal due process for every criminal defendant-was announced in Dusky v. United States , 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). Under the so-called Dusky test, competency to stand trial in a criminal case requires more than being oriented to time and place and having some recall of events. Id. , 80 S.Ct. 788. The defendant instead must have (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "a rational as well as *864 factual understanding of the proceedings against him." Id. ; see also Drope v. Missouri , 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (reaffirming Dusky test; fitness to proceed entails "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing [a] defense"). The Dusky standard has "a modest aim: It seeks to ensure that [a defendant] has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran , 509 U.S. 389, 402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) ; see also Brown v. O'Brien , 666 F.3d 818, 825 (1st Cir. 2012), cert. den. , 567 U.S. 938, 133 S.Ct. 32, 183 L.Ed.2d 683 (2012) (competence to stand trial is a narrowly focused concept, one that does not necessarily preclude fitness to stand trial despite various mental afflictions from which defendants may suffer).
Dusky involved competency to stand trial. Although it is fundamental that a defendant must also be competent for sentencing, *400 [21] the Supreme Court has never had a case in which it resolved whether Dusky or some other standard applies at the sentencing phase. Numerous lower federal courts, however, have considered that issue. With apparent uniformity, federal courts hold that the Dusky test applies to determine competency for purposes of sentencing, as well as for competency to stand trial. United States v. Dreyer , 705 F.3d 951, 961 (9th Cir. 2013).[22] Also with apparent uniformity, federal courts hold that, although the "level of competency" required under Dusky does not vary with the stage of the criminal proceeding involved, the defendant's abilities must *865 be evaluated "in light of the type of participation required" at a particular stage. Dreyer , 705 F.3d at 961.[23] Thus, in the context of competency to be sentenced, the federal test evaluates a defendant's "ability to participate or assist his counsel" and to "understand the nature of the proceedings and participate intelligently" in light of what a sentencing proceeding entails. Id.
The statutory standard under ORS 161.360(2) implies the same standard. The evaluation of a defendant's understanding of "the nature of the proceedings against the defendant," ORS 161.360(2)(a), necessarily requires consideration of the particular proceeding involved. So, too, does an evaluation of a defendant's ability to "assist and cooperate with the counsel of the defendant" and to "participate in the defense." ORS 161.360(2)(b), (c). To be meaningful, those evaluations must be made by reference to the particular proceeding that a defendant faces (i.e. , entry of plea, trial, sentencing), rather than an abstract conception of criminal proceedings more generally or in toto .
In short, for both state and federal law purposes, a defendant's competency to be sentenced is tested by the same standard that applies to other stages of the criminal proceeding, but the assessment must be specific to the context of sentencing and what a sentencing proceeding entails. The three-part competency test articulated by the trial court, which we earlier quoted verbatim, comports with that standard. The trial court's test focused on defendant's present ability to consult with his attorney, whether he had a rational understanding of the proceedings, and whether he had a factual understanding of the proceedings. The court qualified each part of the test by adding "to the extent that *866 understanding and participation are called for in a sentencing hearing." Although defendant seizes on the trial court's comment that the test it was adopting is a "lesser standard" than "the legal test for fitness to proceed at trial," the trial court appears to have used that descriptor to convey only that it was tailoring the standard to *401 the sentencing context (which was the descriptor defense counsel used for a sentencing-tailored standard in argument during the hearing). What matters is not the descriptor the court used, but the test itself. That test, we conclude, was legally correct.
3. The trial court's competency determination
Defendant's next argument is that, under either the Dusky standard as it applies to competency to stand trial or under that standard as tailored to the sentencing context, the record establishes that defendant was not competent to be sentenced, contrary to the trial court's determination. The appropriate starting point is our standard of review.
The legislature has charged trial courts with significant responsibility in identifying, overseeing, and resolving competency issues that may arise during criminal proceedings. See generally Oregon State Hospital v. Butts , 358 Or. 49, 58-63, 359 P.3d 1187 (2015) (extensive discussion of the statutory framework giving trial courts authority and responsibility to ensure a criminal defendant's competency). Once a defendant's competency has been drawn into question, the trial court must determine if defendant is fit to proceed, even if the parties do not disagree on the issue. ORS 161.370(1).[24] When the parties do disagree, so that competency is a contested issue, the trial court must conduct a hearing at which it must "consider all relevant evidence," "weigh medical *867 evidence," and "make appropriate determinations regarding a defendant's" fitness to proceed. Butts , 358 Or. at 63, 359 P.3d 1187. As part of the relevant evidence before it, the trial court may consider not only the opinions of expert witnesses, but its own observations of the defendant and the defendant's interactions with others during the proceedings. State v. Cunningham , 197 Or.App. 264, 289-90, 105 P.3d 929, rev. den. , 339 Or. 406, 122 P.3d 64 (2005) ; see Brown , 666 F.3d at 826 (competency to stand trial is matter of degree and one in which trial judges, as well as health professionals, have pertinent expertise).
Thus, in exercising its "ultimate decision-making authority over fitness proceedings," the trial court is the trier of fact, charged with weighing the medical and all other relevant evidence, and then coming to a decision. Butts , 358 Or. at 63, 359 P.3d 1187. Our role in reviewing the trial court's decision is not to reweigh evidence or assess whether the evidence supports factual findings different from those made by the trial court. As in other contexts where the factfinding is entrusted to the trial court, we review only to determine if the record and all reasonable inferences that could be drawn from the evidence, viewed in the light most favorable to the trial court's decision, supports the court's findings. See generally Ball v. Gladden , 250 Or. 485, 487, 443 P.2d 621 (1968) (stating general standard). Our role is no different when the issue involves psychological evaluations and expert assessments of a defendant's functioning. There, too, we review only to determine if the record is sufficient to support the decision that the trial court reached. See Kinkel v. Persson , 363 Or. 1, 27-30, 417 P.3d 401 (2018) (in resolving constitutional challenge to petitioner's sentence, court would defer to trial court's express and implicit findings, based on medical evidence, as to nature of petitioner's psychological problems, their permanence, and likelihood that petitioner will remain dangerous because of them).
Consistent with our standard of review, the question before us is whether, viewed in the light most favorable to the trial court's resolution of the issue, the record supports the trial court's competency determination.
*402 Having reviewed that record in full, we readily conclude that it does. By way of brief summary only, the evidence established that defendant, although he had significant memory deficits, also *868 had significant understanding and recall. That was true in terms of everyday events[25] as well as defendant's own personal history.[26] It was also true of defendant's ability to understand and recall the criminal proceedings that had transpired to date. For example, in his clinical interview with Dahl, defendant
"reported that he is incarcerated because the judge sent him to jail after he was found guilty of sexual abuse charges. He said he and his attorney entered a plea of not guilty at his trial, but the jury came back with a guilty verdict. He recalled that three victims testified against him at trial, as well as other witnesses. When asked to identify which witnesses testified at his trial, he initially stated a previous boyfriend of his niece was the only witness who testified. He then recalled that the father of the two younger victims also testified."
Defendant also reported that the victims had accused him of crimes that had happened "many, many years ago" and that he was the victim of "a conspiracy orchestrated by his niece." Defendant maintained, as he had at trial, that he was innocent of the charges.
With regard to the sentencing proceeding that defendant was facing, defendant understood that the judge would make the ultimate decision on his sentence; that his attorney could make arguments that might influence the sentencing decision; and that it would be important to present information about defendant's background and character for purposes of sentencing. Dahl, in fact, assessed defendant as "more likely than others in a similar situation to disclose everything about his case to his lawyer," and, at the time of *869 Dahl's interview with defendant, he told Dahl that he was working with his attorney to collect character witness letters to describe to the judge "the good things he had done in his life." During Gordon's clinical interview of defendant, when Gordon asked defendant about what might happen at his sentencing, defendant understood that "he could be sentenced to ten years," and he spontaneously offered Gordon his own observation that a 10-year sentence would amount to "a life sentence for him."
In determining that defendant was competent for purposes of sentencing, Gordon took into account that "[t]here are things that [defendant] remembers and was able to express and other things that he did not remember." But defendant was not suffering from "gross memory impairment." In Gordon's opinion, despite the "holes" in defendant's memory, defendant's cognitive functioning was "minimally adequate" for sentencing purposes-meaning that it met or exceeded the minimum threshold for legal competency. Gordon assessed defendant as "able to understand the nature of the proceedings as they were related to sentencing"; as able to "assist and cooperate with counsel, with his attorney, as it relates particularly to the sentencing proceeding"; and as able "to participate in the defense, as limited to whatever portion he could participate in for purposes of sentencing." In his assessment of defendant's ability to participate at sentencing as appropriate, Gordon specifically considered defendant's ability to "allocute"-that is, to speak personally to the judge at sentencing. See generally DeAngelo v. Schiedler , 306 Or. 91, 93-94, 93 n. 1, 757 P.2d 1355 (1988) (defendant's right to be heard in criminal prosecution encompasses *403 common law right of "allocution," which is "a convicted defendant's opportunity to speak before sentencing"). Gordon's understanding was that a defendant may use notes and other aids in making a statement at sentencing; defendants "don't have to remember everything they want to say."[27] Gordon concluded that defendant had the ability to *870 allocute at sentencing, even if, as defendant had expressed to Gordon in the clinical interview, defendant "felt" he could not because of his problems with his memory.[28]
In challenging the trial court's competency determination, defendant essentially invites us to reweigh the evidence. Defendant argues that this court "should conclude that * * * defendant was not competent to be sentenced," urging, for example, that the record is "replete" with examples of defendant's inability to rationally understand the "import and full scope of the proceedings." Relying on Dahl's qualitative assessment of how defendant's memory deficits affected his actual functioning, defendant urges that his ability to reason was "extremely low" and he had no ability to take in and weigh information in making decisions. In a similar vein, defendant charges that both Gordon and the trial court "relied too heavily" on defendant's ability to "say the right thing" on occasion, which Dahl believed was superficial and masked defendant's cognitive impairments.
To be sure, the record contains countervailing evidence that the trial court could have weighed differently-aspects of defendant's understanding and memory that were either deficient, legally unsophisticated, or expressed in ways that were inarticulate or less than fully rational. But in deciding which expert opinion was more persuasive and what weight to give the competing evidence, the trial court engaged in a quintessential factfinding and decision-making role, one that the legislature has entrusted trial courts, not this court, to perform. See Butts , 358 Or. at 61-63, 359 P.3d 1187 (describing statutory framework and trial court's responsibilities for competency determinations; declining *871 in mandamus proceeding to substitute reviewing court's judgment of weight of competing evidence for that of trial court). Our job is not to make the determination anew or to second-guess the competency determination made by the trial court. We therefore decline to exhaustively discuss the bases on which the trial court may have found Gordon's opinion more persuasive than Dahl's. The question for us is whether the record supports the determination that the trial court made. It does. Defendant's challenge to the trial court's determination therefore fails.
B. Motion for New Trial (Defendant's Competency to Stand Trial)
The remaining issue that defendant raises on appeal is whether the trial court erred in denying his motion for new trial. As we earlier outlined, after the trial court denied defendant's sentencing competency motion, defendant moved for a new trial under ORCP 64 B(4) based on newly discovered evidence that he argued would have likely changed the result at trial. Defendant urged that, had the evidence of defendant's neurocognitive disorder been available at the time of trial, defendant, due to incompetency to stand trial, would not have been "tried, convicted, and sentenced to over ten years in *404 prison." At the hearing on the motion, the parties stipulated to including the testimony and the exhibits from the sentencing competency hearing as part of the record on the motion for new trial. The defense also called defendant's trial counsel as a witness to establish that defendant's incompetency was "newly discovered" and "could not with reasonable diligence have been discovered and produced at trial." ORCP 64 B(4).[29] And the defense again called Dahl as an expert witness, who supplemented *872 her prior testimony by giving her opinion, based on her post-trial evaluation of defendant, that defendant had not been competent at the time of his trial. Without calling any additional witnesses, the state relied on the record from the sentencing hearing together with the further evidence adduced on the motion for new trial. At the end of the hearing, the trial court concluded that defendant had not carried his burden to show that he was incompetent at the time of his trial, and the court denied the motion.
Defendant's motion for new trial thus raised an issue closely related to the issue at his sentencing-defendant's competency to stand trial as opposed to his competency to be sentenced. The legal standard for assessing his competency was the same standard under ORS 161.360 and Dusky that we earlier discussed, without the tailoring to the sentencing context. The procedural posture differed, in that defendant, as the moving party, had the burden of proof on the disputed issues-here, on whether the newly discovered evidence of his neurocognitive disorder would likely change the outcome at trial. See Mitchell v. Mt. Hood Meadows Oregon , 195 Or.App. 431, 460, 99 P.3d 748 (2004) (movant bears "burden to demonstrate that the requirements" for granting new trial have been satisfied).[30] The trial court's role, however, was the same. The trial court served as the finder of fact as well as the ultimate decision-maker. See State v. Disorbo , 54 Or.App. 877, 882, 636 P.2d 986 (1981) (at hearing on motion for new trial, trial court is finder of fact and determines likelihood that newly discovered evidence would change result of trial). Our review, likewise, is the same: We review the record to determine whether it supports the trial court's findings and ultimate determination, not to substitute our judgment for that of the trial court. Id. ; State v. Quiring , 41 Or.App. 767, 772, 598 P.2d 1294, rev. den. , 288 Or. 81 (1979).
In many respects, then, our analysis of defendant's final claim of error reprises our analysis of his challenge to the trial court's ruling on sentencing competency. In denying the motion for new trial, the trial court had before it much of the same evidence. Although Dahl testified a second *873 time, she had not performed any additional or different clinical testing of defendant's cognitive abilities; her opinion was based on the same "methods and analysis" that the trial court had found less persuasive than those of Gordon's for purposes of evaluating defendant's competency to be sentenced.
The principal difference between Dahl's testimony at the sentencing hearing and her testimony on the motion for new trial was Dahl's use of her prior testing and evaluation to make a retrospective evaluation of defendant's competency at the time of trial. She had performed her competency evaluation of defendant in August 2015. At the hearing on the motion for a new trial, Dahl offered her opinion on defendant's competency at the time of trial, in May 2015, some four months before her competency evaluation.
*405 In forming her opinion, Dahl encountered the same problem that courts perceive with retrospective competency evaluations: They are inherently difficult to make. See Pate v. Robinson , 383 U.S. 375, 387, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (where trial court failed to hold necessary competency hearing, Court declined to remand for retrospective competency hearing due to difficulty of determination and instead ordered new trial at which current competency could be evaluated, if still in dispute); United States v. Brugnara , 856 F.3d 1198, 1215 (9th Cir. 2017) (competency evaluations performed after trial are minimally probative on issue of competency during trial). Although Dahl offered her ultimate opinion that defendant was not competent to stand trial several months before she evaluated him, her testimony provided the trial court, as the finder of fact, with reason to lack confidence in her conclusion.
In particular, when Dahl was asked by defense counsel whether, to a reasonable degree of medical certainty, defendant's competency at the time of trial would have been comparable to how Dahl assessed it four months later, her immediate response was: "It's hard to say * * * without being able to go back in time." Dahl did eventually testify that, to a reasonable degree of medical certainty, in her opinion it was "highly likely" that defendant's competency was the same at the time of trial as she assessed it to be four months *874 later. But she continued to express the difficulty of making a retrospective assessment. As she summarized at one point in her direct testimony:
"It's hard to know exactly where he was in May because I didn't see him until July and so since I can't look into the past, and I don't have any reports of how he was functioning in May, it's difficult."
Later, in seeming frustration with the prosecutor's line of cross-examination asking Dahl if she could go back several years in assessing defendant's competency, Dahl said "Counselor, I'm having a hard time telling you his mental state last year * * * because it's-it's retro-respective."
But the record was not devoid of evidence of how defendant was functioning in May. Defendant's trial counsel testified at the motion for new trial. He has been a criminal defense attorney for his entire career, beginning in 1994. A "number of times" in the past, he has had reason to doubt a client's competency to proceed. In those circumstances, he has had his client independently evaluated and, depending on the results of that evaluation, he has alerted the trial court to the possible issue. In defendant's case, his trial counsel did not, at any point before or throughout the trial, have concerns about defendant's competency or ability to aid and assist in his defense. Instead, after trial and while preparing for sentencing, trial counsel asked Dahl to evaluate defendant for purposes of mitigation at sentencing. Trial counsel developed his first concerns about defendant's cognitive functioning while working with defendant in preparation for sentencing and preparing for Dahl's evaluation. Even then, in counsel's mind, he questioned whether the problem rose to the level of a competency issue. It was only in light of Dahl's assessment that he raised the competency issue with the trial court.
Along with that additional evidence, the trial court had its prior determination that defendant was competent for purposes of sentencing and the record that supported that determination. In denying the motion for a new trial, the court expressly found that Dahl's opinion was "to some degree speculative in nature." Beyond that, in implicitly finding Dahl's opinion unpersuasive, the trial court observed that, in general, the record contained evidence that was *875 "countervailing to her opinion." As one "countervailing fact to [Dahl's] opinion," the court highlighted that defendant's trial counsel was "extremely experienced" and saw no problems with defendant's cognitive functioning until after the trial. "[A]nother countervailing fact to [Dahl's] ultimate conclusion" was the trial court's own conclusion, based on its observations of and interactions with defendant during trial, that defendant was able to understand and rely on his attorney's advice in deciding whether to testify, which was the kind of decision that Dahl believed defendant was unable to make. The trial court briefly touched on a few other aspects of the evidence that countervailed Dahl's conclusion, *406 although they were less significant in the court's assessment. The court concluded by emphasizing that defendant had the burden of proof in the hearing, and then denied the motion for new trial.
Defendant's challenge to the trial court's ruling, like his challenge to the trial court's ruling on competency to be sentenced, invites us to weigh the evidence differently than the trial court weighed it. Emphasizing Dahl's opinion, together with other evidence in the record and inferences that arguably might be drawn from that evidence, defendant urges that "the record supports the conclusion that defendant was incompetent during trial." But that is not the question for this court, just as it was not the question for this court in reviewing the trial court's determination of defendant's competency to be sentenced. On appeal, the only question is whether the record supports the conclusion that the trial court reached. As we have outlined above, it does. Defendant's arguments provide no basis to conclude that, as a matter of law, the trial court was required to reach a different conclusion on the evidence before it. Defendant's challenge to the trial court's denial of the motion for new trial therefore fails.
IV. CONCLUSION
To summarize: First, we do not reach the issue of whether the trial court erred in admitting the double hearsay evidence under OEC 803(18a)(b), because that evidence, even if not admissible, was harmless. Second, in resolving the issue of defendant's competency to be sentenced, the trial court articulated the correct legal standard and the *876 record amply supports the trial court's decision. Third, the record likewise amply supports the trial court's denial of defendant's motion for new trial based on its conclusion that defendant had not carried his burden to show that defendant was incompetent at the time of trial.
Affirmed.

Defendant raises those two issues through four assignments of error. The first three relate to defendant's competency: (1) The trial court erred when it denied defendant's motion for a new trial based on newly discovered evidence that defendant was not competent at the time of trial; (2) the court erred when it concluded that due process did not require vacating his criminal judgment based on that same evidence; and (3) the court erred when it sentenced defendant while defendant was incompetent. Defendant's fourth assignment of error challenges the admission of double hearsay evidence. We discuss the issues in the reverse order of defendant's assignments of error.

KCH's description of defendant's touching on the bed was the basis for one of the seven charges of first-degree sexual abuse (Count 8). Although the other sexual contacts that KCH said that she remembered were not the basis for any of the charges in this case, KCH related what she could about them during her direct testimony, and she was cross-examined about them extensively.

Defendant's alleged sexual contacts with KLM when hugging her was the basis for a single charge of first-degree sexual abuse (Count 7); his alleged sexual contacts with her while swimming were the basis for two charges of first-degree sexual abuse (Counts 5 and 6).

SAM's description of defendant's contacts while swimming with her was the basis for a single charge of first-degree sexual abuse (Count 4). Her description of the contact that occurred when defendant put lotion on her was the basis for one count of first-degree sexual abuse (Count 2). Her description of defendant showing her a pornographic video and having her touch his penis was the basis for one count of first-degree sexual abuse (Count 3). Finally, her description of defendant digitally penetrating her vagina while in the living room was the basis for one count of unlawful sexual penetration in the first degree (Count 1).

KCH at the time was getting her master's degree in social work. As part of her studies, she learned about her duty as a "mandatory reporter" to bring suspected child abuse to the attention of authorities. She testified that her appreciation of the importance of reporting child abuse, together with her work with her therapist on overcoming her anxiety about disclosing the abuse, led her to finally contact authorities despite the family pressure she felt not to expose defendant to criminal charges.

CARES is a regional child abuse assessment center for the northern region of the state. The acronym CARES originally stood for "Child Abuse Response and Evaluation Services." State v. Norby , 218 Or.App. 609, 612, 612 n. 1, 180 P.3d 752 (2008).

The twins' mother was called first as a hostile witness for the state and later by the defense. At trial, she denied having made many of the statements that the detective testified she had made when the detective interviewed her.

Defendant asserts that the credibility of the victims was so "intertwined" that the corroboration of any one victim's allegation of sexual abuse necessarily bolstered the credibility of all allegations of sexual abuse by all three victims. Assuming, for present purposes only, the correctness of defendant's premise, evidence bolstering the credibility of any one victim must also be treated as bolstering the credibility of all three. We therefore describe the "cumulative" evidence accordingly.

Indeed, in our legal system, there is no more time-honored and valued way of assessing a witness's credibility than by requiring the witness to testify under oath, in the courtroom, subject to the "crucible of cross-examination." See generally Crawford v. Washington , 541 U.S. 36, 61-62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (discussing value of constitutional right of confrontation).

Here, defendant's principal argument is that the challenged evidence more strongly corroborated SAM's allegations than her other consistent prior disclosures. Defendant's prejudice argument is not extensive, but it is sufficiently developed to identify what defendant does not argue. And defendant does not argue that the challenged testimony amounted to "other crimes" evidence that prejudiced defendant because it was inadmissible evidence of character or propensity. See generally State v. Baughman , 361 Or. 386, 403-05, 393 P.3d 1132 (2017) (discussing nature of other crimes evidence and prejudice that often outweighs probative value of such evidence).

See generally Webster's Third New Int'l Dictionary 1882 (unabridged ed. 2002) (defining "rape" as including not only "illicit sexual intercourse without the consent of the woman and effected by force * * *," but also "sexual aggression other than by a man toward a woman"); see also The American Heritage Dictionary of the English Language 1017 (5th ed. 2011) (term "rape" includes, in addition to forcible sexual intercourse: "1. * * * b. The crime of using force or threat of force to compel a person to submit to some other sexual penetration. c. Other unlawful sexual intercourse or penetration, as with an unconscious person or person below the age of or incapable of consent. d. An instance of any of these crimes").

See generally Charles A. Phipps, Children, Adults, Sex and the Criminal Law: In Search of Reason , 22 Seton Hall Legis. J. 1, 44 (1997) ("Some states create one broad offense encompassing all conduct involving sexual penetration of body orifices. Other states retain the older classification, with a rape statute applicable only to vaginal intercourse and other statutes * * * applicable to all other penetration offenses. In most cases, the penalties are comparable, whether all like offenses are grouped together or separated."). Utah, Kansas, Washington, and California are examples of states that define the crime of rape to include vaginal penetration by any means, including digital penetration. State v. Patterson , 407 P.3d 1002, 1004 (Utah App. 2017) ; State v. Eddy , 299 Kan. 29, 32, 321 P.3d 12 (2014) ; State v. Tili , 139 Wash.2d 107, 113-14, 985 P.2d 365 (1999) ; People v. Wilcox , 177 Cal.App. 3d 715, 717, 223 Cal.Rptr. 170 (Ct. App. 1986). Although in Oregon penile rape and other acts of sexual penetration are criminalized by different statutes, the offenses are related, of comparable seriousness, and carry the same penalty. See generally State v. Alwinger , 236 Or.App. 240, 246-47, 236 P.3d 755 (2010) (legislature constitutionally could deem unlawful sexual penetration as equally serious as rape and impose same penalty for both offenses).

The record reflects that all three victims had significant discomfort describing their memories of the traumatizing sensations and physical contacts that resulted from defendant's sexual contacts with them. KLM and SAM, in particular, were uncomfortable with sexually explicit terminology. Throughout interviews with police and CARES evaluators, as well as on the stand, neither KLM nor SAM once spoke words like "vagina" or "penis" or "penetration." Both at trial and during the CARES interviews, the adults questioning them had to establish alternative terminology, such as defendant's "private" for "penis," and the "inside part" of the victims' bodies for "vagina," in order for KLM and SAM could be comfortable enough to answer questions.

Our view of the record is reinforced by the fact that defense counsel objected to the challenged testimony on hearsay grounds only. If, as the dissent argues, KLM's statement in the telephone call could have or likely would have been understood by the jury to be a claim that defendant committed an uncharged act of rape, the natural objections to follow defendant's hearsay objection would have been a relevancy objection under OEC 404 and an objection under OEC 403 that the prejudice of that uncharged other crime outweighed its probative value. See Baughman , 361 Or. at 403-05, 393 P.3d 1132 (discussing analysis under both OEC provisions). The fact that defense counsel did not make those further objections is telling and suggests that, at the time of trial, the defense did not (just as the defense does not now, on appeal, 294 Or.App. at 854 n. 10, 433 P.3d at 394 n. 10) share the dissent's view about how the statement "could" have been understood by the jury.

Both defendant and the dissent assume, without careful analysis, that all eight convictions involving all three victims must be reversed. Were we to conclude that the challenged testimony was prejudicial, we would need to make a more precise and reasoned assessment than either defendant or the dissent makes of which charges must be reversed. See, e.g. , State v. Freitas , 243 Or. App. 231, 237-38, 259 P.3d 46 (2011), rev. den. , 351 Or. 545, 274 P.3d 184 (2012) (erroneous admission of disclosure during CARES interview warranted reversal only as to charges related to disclosure; error not prejudicial as to other charges involving other victims); Irons , 162 Or.App. at 524-26, 987 P.2d 547 (similar).

Defendant alternatively moved to vacate the judgment on due process grounds based on his incompetency to stand trial. The trial court denied that motion for the same reasons that it denied defendant's motion for new trial. On appeal, defendant renews his position on the motion to vacate in the event we determine that "this matter cannot be heard in the context of a motion for new trial." We do not separately consider the trial court's ruling on defendant's motion to vacate the judgment. Our analysis on that motion is the same as our analysis on the motion for new trial.

Dahl and Gordon agreed on the appropriate standardized psychological tests to use to assess defendant's cognitive functioning. Indeed, Gordon relied on the tests performed by Dahl because his evaluation was performed too soon after hers for the tests to be repeated with valid or reliable results. The two experts also agreed that defendant's competency to proceed should be assessed pursuant to ORS 161.360 and the test used by federal courts, and they both assessed defendant's competency with reference to the particular tasks involved in a sentencing proceeding.

In making that finding, the court noted that one of Dahl's standardized tests had asked defendant 61 questions about his understanding of the legal process. The test is used by forensic psychologists to determine if a person is feigning incompetency. Defendant answered 59 of the 61 questions correctly, which satisfied both Dahl and Gordon that defendant was not feigning memory impairment. In expressing its surprise at the strength of defendant's legal understanding, the court stated that it considered that test to be "substantive evidence" of defendant's understanding, even though the experts had used the test only to determine if defendant was "malingering." Defendant argues that the trial court's reliance on that test score was "irrational" because the experts did not rely on it in the same way. We disagree that the trial court was bound by the experts' clinical use of the test and could not draw common-sense inferences from how defendant performed on it. See ORS 161.370(1) (trial court in competency determination may consider all relevant evidence).

ORS 161.365 sets out the court's general authority to hold a hearing and call witnesses to resolve incapacity issues under ORS 161.360, to order the assistance of psychiatric and psychological evaluators, and to enlist certain county and community health program services.

We disagree with defendant's argument-which the state does not directly address-that the trial court rejected the applicability of the standard set out in ORS 161.360(2). Two weeks before the evidentiary hearing that the trial court held on defendant's motion to determine competency, the trial court had ruled that subsection (1) of the statute, which authorizes the trial court to order an evaluation, does not extend to sentencing. The trial court did so in the context of resolving defendant's request for an evaluation performed by OSH. The court was unsure that OSH would interpret the statute to authorize an evaluation at state expense for sentencing purposes. The court therefore made that ruling to set up the issue for a possible mandamus by defendant, which potentially would lead to a quick resolution by the Oregon Supreme Court. As it happened, however, OSH agreed to perform the evaluation, which mooted the issue. In making the substantive competency determination two weeks later, the trial court did not declare the legal standard set forth in subsection (2) of the statute inapplicable to sentencing for purposes of the standard of competency that applies. Instead, the trial court appeared to proceed on the premise that the statute is parallel in its requirements to the federal standard and that the court therefore did not have to analyze the two standards separately or resolve the statute's applicability.

That proposition flows from the fact that sentencing is a critical stage of a criminal proceeding that must satisfy due process requirements. Gardner v. Florida , 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The Supreme Court has readily extended competency requirements to criminal trial proceedings in general, including pretrial and post-trial stages. Godinez , 509 U.S. at 399, 113 S.Ct. 2680 (entry of plea); Drope , 420 U.S. at 181, 95 S.Ct. 896 (start of and throughout trial). Consequently, no state or federal court, or other authority of which we are aware, questions the proposition that a defendant in a criminal case must be competent by some standard before being sentenced, even though the Supreme Court has not expressly so held.

See also, e.g. , United States v. Ahrendt , 560 F.3d 69, 74 (1st Cir. 2009) ("The obligation to determine competency to stand trial [based on the Dusky standard] is continuing, and persists throughout a proceeding including through the sentencing phase."); United States v. Washington , 271 Fed.Appx. 485, 490 (6th Cir. 2008) (applying Dusky standard to competency to proceed to sentencing); United States v. Chaudhry , 646 F.Supp.2d 1140, 1146 (N.D. Cal. 2009) (Dusky , as codified at 18 USC § 4241(d), applies to penalty phase of criminal case).

See also Chaudry , 646 F.Supp.2d at 1148 (competency at sentencing requires ability to understand nature of the proceedings and participate intelligently "to the extent participation is called for" (quoting and citing with approval Chavez v. United States , 656 F.2d 512, 518 (9th Cir. 1981) ) ); United States v. Gigante , 996 F.Supp. 194, 198 (E.D. N.Y. 1998) (competency for purposes of sentencing requires understanding nature of "sentencing," prospective punishment, and why punishment is being imposed; ability to "assist in defense" is ability to assist for purposes of sentencing); United States v. Pellerito , 878 F.2d 1535, 1544 (1st Cir. 1989) (competency for purposes of sentencing requires consideration of defendant's ability to assist and participate in adversarial process specific to sentencing, such as reviewing presentence investigation report and exercising right of allocution).

ORS 161.370(1) provides:
"When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed under ORS 161.365, the court may make the determination on the basis of the report. If the finding is contested, the court shall hold a hearing on the issue. If the report is received in evidence in the hearing, the party who contests the finding has the right to summon and to cross-examine any psychiatrist or psychologist who submitted the report and to offer evidence upon the issue. Other evidence regarding the defendant's fitness to proceed may be introduced by either party."

As related in Gordon's written evaluation, defendant's "recent and remote memory showed some mild difficulties," but he did not lack memory. During Gordon's interview, among many other facts that defendant recalled, defendant recounted what he had eaten at his last meal and had done the day before; that the last holiday was Veterans Day and the next would be Thanksgiving; and the names of the current and previous Presidents.

For example, defendant was able to provide Gordon with "detailed descriptions of previous injuries, surgeries, and medical conditions" over the course of his life and recited the particular medications he takes and the reasons he takes them. And by way of his full personal history, defendant knew his birthdate, the years in which he married and divorced, and remarried; that he had seven grandchildren between the ages of 14 and 36 or 37; and various details about his general military and work history.

In some circumstances, in fact, a defendant may be required to read from a written statement prepared in advance of sentencing. State v. Rogers , 330 Or. 282, 301, 4 P.3d 1261 (2000). Certainly, nothing precludes a defendant from using notes, reading a written statement prepared in advance, or using other accommodations to facilitate a defendant's ability to allocute at sentencing.

Defendant argues that his expressed reluctance to allocute demonstrates his lack of competency, because his decision was not "rationally made" but instead was "dictated by his deficits." The point proves too much. Defendant's self-awareness of his limitations is no different than any number of other "deficits" or disabilities that might cause a defendant to make a reasoned assessment of his or her comfort level or likely effectiveness in addressing a sentencing judge. A defendant might, for example, decide not to personally address the judge at sentencing because the defendant gets exceedingly nervous, or is self-conscious about having a speech impediment or not speaking fluent English, or by force of personality lacks self-control and is disrespectful to authority figures. A defendant's decision in those circumstances, even if based on some protected status, disability, or deficit, is not "irrational" and does not reflect a lack of ability to allocute.

Under ORCP 64 B(4), a trial court "may" set aside a judgment and grant a new trial based on "[n]ewly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at trial." The defense presented trial counsel's testimony as part of its prima facie showing that evidence of defendant's neurocognitive deficits was newly discovered and could not reasonably have been discovered in time for trial. The state did not contest that showing or argue to the contrary. The issue for the trial court, therefore, narrowed to the materiality of the evidence-whether it would "probably change the result if a new trial is granted." Greenwood Products, Inc. v. Green Forest Products, Inc. , 357 Or. 665, 684, 359 P.3d 219 (2015) (explaining import of materiality prong of new trial rule).

In contrast, in a competency proceeding under ORS 161.360, the statute does not allocate the burden of proof. Cunningham , 197 Or.App. at 288 n. 12, 105 P.3d 929.